Justin D. Smith, Mo. Bar No. 63253*
Michael E. Talent, Mo. Bar. No. 73339*
James Otis Law Group, LLC
13321 North Outer Forty Road, Suite 300
St. Louis, Missouri 63017
Telephone: (816) 678-2103
Justin.Smith@james-otis.com

*Attorneys for Plaintiffs Arizona State Legislature, Treasurer Kimberly Yee, Mohave County, Colorado City, and Fredonia*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Arizona State Legislature, by and through the President of the Arizona Senate, Warren Petersen, and the Speaker of the Arizona House of Representatives, Ben Toma;

Kimberly Yee, in her official capacity as Treasurer of the State of Arizona;

Mohave County, Arizona;

Colorado City, Arizona;

Fredonia, Arizona;

Plaintiffs,

v.

Joseph R. Biden, Jr., in his official capacity as President of the United States;

Deb Haaland, in her official capacity as Secretary of the Interior;

U.S. Department of the Interior;

Case No. _____

**COMPLAINT**

Tracy Stone-Manning, in her official capacity as Director of the Bureau of Land Management;

Bureau of Land Management;

Tom Vilsack, in his official capacity as Secretary of Agriculture;

U.S. Department of Agriculture;


Defendants.

## NATURE OF THE CASE

1.     In medieval England, after the Norman Conquest, the British Crown could declare land a royal forest and reserve it "solely for the king's royal diversion." 2 William Blackstone, *Commentaries* *416.

2.     The Biden Administration's interpretation of the Antiquities Act, 54 U.S.C. § 320301, *et seq.*, creates a new royal forest law.

3.     The Antiquities Act gives the President the discretion to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." § 320301(a).  "The President may reserve parcels of land as a part of the national monuments.  The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected." § 320301(b).

4.     Once something has been declared a monument, the President's administration may then strictly limit the use and development of the land.  Indeed, the administration can stop it altogether.

5.     The Biden Administration reads the law as permitting it to declare things that

are not monuments in common parlance, or within the original meaning of the Antiquities Act, to be monuments, including—but not limited to—animals, plants, and entire landscapes.   The result:   The only thing preventing the Biden Administration from declaring all federal land a national monument is its discretion.

6.   This case illustrates the point—and the reason for judicial intervention to stop this unlawful land grab.  On August 8, 2023, President Biden created the Baaj Nwaavjo I'tah Kukveni-Ancestral Footprints of the Grand Canyon National Monument (the "Ancestral Footprints Monument"), Proclamation 10606 of August 8, 2023, 88 Fed. Reg. 55,331 (Aug. 15, 2023) (the "Proclamation"), which comprises over 900,000 acres of land in Mohave County and Coconino County in Northern Arizona.

7.   The Proclamation essentially prohibits further use and development of the land, despite the fact those lands are available for the mining of important natural resources, such as uranium, that financially benefit Arizona's state and local governments and schools.

8.   The Proclamation ignores all that.  It also ignores numerous congressional laws relating to federal land use and conservation—and the fact that Congress has expressly declined to do exactly what the Biden Administration did here and cut off the Ancestral Footprints Monument land from further development.

9.   That land grab is unlawful.  Congress passed the Antiquities Act to protect just that: antiquities.  It did not pass the law to allow the Biden Administration to declare every inch of federal land a federal forest, cut off from all but those it selects.

## PARTIES

10.   Plaintiff Arizona State Legislature is the elected representative portion of the legislative authority of the State of Arizona.  Ariz. Const. art. IV, pt. 1 § 1.  The Legislature consists of the 30-member State Senate and the 60-member House of Representatives. The Legislature is directly elected by the People of Arizona.  The Arizona State Legislature has exclusive authority over legislative functions.  *See* Ariz. Const. art. III; *State ex rel. Woods v. Block*, 942 P.2d 428, 434 (Ariz. 1997).

11.     By rule, each house of the Arizona State Legislature has delegated to its presiding officers, President Warren Petersen and Speaker Ben Toma, the authority to raise and defend in any forum "any claim or right arising out of any injury to the [chamber]'s powers or duties under the constitution or laws of this state." *See* Ariz. Senate Rule 2(N); Ariz. House of Reps. Rule 4(K).  President Petersen and Speaker Toma have exercised this authority and bring this lawsuit on behalf of the Arizona Senate and the Arizona House of Representatives.

12.     Plaintiff Arizona State Treasurer Kimberly Yee is the elected treasurer of Arizona.  Ariz. Const. art. V, § 1(A).  Treasurer Yee is responsible for the receipt and investment of all revenue from Arizona State Trust Land.  Ariz. Const. art. 10, § 7(A), (C); ARIZ. REV. STAT. § 41-172(A)(2), (6).  Treasurer Yee is the chair of the State Board of Investment, which is a trustee of the Permanent Land Endowment Trust Fund that receives all revenue from State Trust Land.  Ariz. Const. art. 10, § 7(A), (D); ARIZ. REV. STAT. § 35-311(A), (B).  Treasurer Yee also serves as the surveyor-general with respect to the selection of lands and a member of the Selection Board, which assigned beneficiaries for all State Trust Lands and approves all annexations of state land.  ARIZ. REV. STAT. §§ 37-202, 41-172(A)(10).

13.     State policy, as embodied in its Constitution, is "[t]o protect the people's freedom and to preserve the checks and balances of the United States Constitution," including by restricting "the actions of its personnel and the use of its financial resources to purposes that are consistent with the constitution . . . ." Ariz. Const. art. 2, § 3(B).  That includes "[p]ursuing" legal remedies and refusing to "enforce, administer or cooperate" with unlawful federal actions or programs.  § 3(B)(3), (C).  Because the Proclamation is unlawful, the Legislature and the Treasurer are thus constitutionally authorized and required to challenge the Proclamation and prevent State resources from being used to effectuate it.

14.     Plaintiff Mohave County is a county in northwest Arizona.  On September 18, 2023, the Mohave County Board of Supervisors passed a motion to lend its support and

become involved in the lawsuit against the designation of the Ancestral Footprints Monument.   On February 5, 2024, the Mohave County Board of Supervisors passed Resolution No. 2024-054, challenging President Biden's actions.

15.     Plaintiff Town of Colorado City is a town in Mohave County, Arizona, in the Arizona Strip.   On January 8, 2024, the Colorado City Town Council passed a resolution authorizing Colorado City to challenge the Proclamation.

16.     Plaintiff Town of Fredonia is a town in Coconino County, Arizona, known as the gateway to the North Rim of the Grand Canyon.   On January 23, 2024, the Fredonia Town Council passed a resolution authorizing Fredonia to challenge the Proclamation.

17.     Defendant Joseph R. Biden, Jr., is the President of the United States and is sued in his official capacity.   President Biden issued the Proclamation establishing the Ancestral Footprints Monument.

18.     Defendant Deb Haaland is the Secretary of the Department of the Interior. She is sued in her official capacity.

19.     Defendant U.S. Department of the Interior (DOI) is a federal cabinet agency and a department of the Executive Branch.   It is responsible for implementing the Proclamation and enforcing, implementing, or administering a subset of statutes, regulations, and other executive-branch actions relating to the Ancestral Footprints Monument.

20.     Defendant Tracy Stone-Manning is the Director of the Bureau of Land Management.   She is sued in her official capacity.

21.     Defendant Bureau of Land Management (BLM) is an agency within the U.S. Department of the Interior.   It is responsible for implementing the Proclamation and enforcing, implementing, or administering a subset of statutes, regulations, and other executive-branch actions relating to the Ancestral Footprints Monument.

22.     Defendant Tom Vilsack is the Secretary of the Department of Agriculture. He is sued in his official capacity.

23.     Defendant U.S. Department of Agriculture (USDA) is a federal cabinet

agency and a department of the Executive Branch.  It is responsible for implementing the Proclamation and enforcing, implementing, or administering a subset of statutes, regulations, and other executive-branch actions relating to the Ancestral Footprints Monument.

24.     Together, Haaland, DOI, Stone-Manning, BLM, Vilsack, and USDA are the "Agency Defendants."

25.     Defendants are not entitled to sovereign immunity.

## JURISDICTION AND VENUE

26.     This action arises under the Constitution of the United States, the Antiquities Act of 1906, 54 U.S.C. § 320301, the Arizona-New Mexico Enabling Act, the Arizona Wilderness Act of 1984, and the court's equitable powers.

27.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the federal claims arise under the Constitution and laws of the United States.

28.     Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202, and the Court's inherent equitable authority.

29.     This Court can award costs and attorneys' fees under 28 U.S.C. § 2412.

30.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are United States agencies or officers sued in their official capacities, a substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of property that is the subject of the action is situated in this District.

## GENERAL ALLEGATIONS

I.     **Congress has protected vast swaths of federal land in Arizona, especially around the Grand Canyon.**

31.     Arizona is a state filled with natural beauty.

32.     People from around the world journey to Arizona to experience the breathtaking majesty of Arizona's natural wonders.

33.     The State of Arizona totals 73 million acres.  *Public Land Statistics 2022*, U.S. Department of the Interior Bureau of Land Management, Table 1-3 (2022) (last visited

1    Feb. 12, 2024).[1]

2    34.    The federal government controls more than 30 million acres of Arizona—

3    about 42% of the State.  *Id.*

4    35.    Since the federal government controls more than four-tenths of the State, it

5    is vitally important to Arizonans how the federal government allows its property to be used.

6    36.    Relevant to this case is how the federal government allows land to be used

7    around the Grand Canyon.

8    **A.    Congress protected the Grand Canyon National Park.**

9    37.    The Grand Canyon is the most prominent of Arizona's many natural

10   wonders.

11   38.    Grand Canyon National Park spans 1,218,375 acres.  National Park Service,

12   *Park Statistics* (last visited Feb. 12, 2024).[2]

13   39.    The Grand Canyon has been protected as a national park since 1919.

14   16 U.S.C. § 221.

15   40.    Only Congress can create national parks.  *See* U.S.C. Title 16.

16   41.    Mining is prohibited in Grand Canyon National Park.  When Congress

17   created it, mining was limited in the Grand Canyon National Park to valid claims existing

18   prior to February 26, 1919.  16 U.S.C. § 224; *see also* 54 U.S.C. § 100732.  No legal mining

19   is now conducted or allowed in Grand Canyon National Park.

20   42.    Thus, for more than 100 years, the Grand Canyon has been preserved for

21   future generations—but preserved by congressional decree.  When Congress declared the

22   Grand Canyon a national park, it revoked President Theodore Roosevelt's declaration,

23   issued before Arizona became a state, that the Grand Canyon was a national monument.

24   44 Stat. 1175, 1178 (1919).

25   **B.    Congress protected the Kaibab National Forest adjacent to Grand**

26

27   [1]     *Available     at*     https://www.blm.gov/sites/default/files/docs/2023-
     07/Public_Lands_Statistics_2022.pdf.

28   [2] *Available at* https://home.nps.gov/grca/learn/management/statistics.htm.

1          **Canyon National Park.**

2          43.     The Kaibab National Forest is adjacent to the north and the south of Grand

3    Canyon National Park.

4          44.     The Kaibab National Forest spans 1,542,791 acres divided into three

5    districts: North Kaibab Ranger District, 655,248 acres; Tusayan Ranger District, 327,250

6    acres; and Williams Ranger District, 560,293 acres.  U.S. Forest Serv., *Kaibab National*

7    *Forest – About the Forest* (last visited Feb. 12, 2024).[3]

8          45.     Areas within the Kaibab National Forest first received protection as a forest

9    reserve in 1893.  *Id.*

10         46.     Additional forests were protected around the Grand Canyon in 1908, 1910,

11   and 1924.  *Id.*

12         47.     The Kaibab National Forest was fully established and protected in 1934.  *Id.*

13         48.     Only Congress can create national forests.

14         49.     According to the United States Geological Service, mining is no longer

15   permitted within protected areas of Kaibab National Forest on the North Rim of the Grand

16   Canyon.   U.S. Geological Serv., *Hydrological, Geological, and Biological Site*

17   *characterization of Breccia Pipe Uranium Deposits in Northern Arizona: Scientific*

18   *Investigations Report 2010-5025*, at 13 (2010) (last visited Feb. 12, 2024).[4]

19         50.     Prior to the Obama Administration's mining moratorium actions that began

20   in 2009, mining was allowed in the Kaibab National Forest, subject to claim and patent

21   requirements and other conditions imposed by federal statute and regulations.  *See, e.g.*, 16

22   U.S.C. § 482o.

23         51.     "[E]ffective October 1, 1994, Congress imposed a moratorium on spending

24   appropriated funds for the acceptance or processing of mineral patent applications that had

25   not yet reached a defined point in the patent review process before a certain cut-off date.

26

27   [3]        *Available      at*       https://www.fs.usda.gov/detail/kaibab/about-
     forest/?cid=STELPRDB5227350.

28   [4] *Available at* https://pubs.usgs.gov/sir/2010/5025/pdf/sir2010-5025.pdf.

Until the moratorium is lifted or otherwise expires, the [Bureau of Land Management] will not accept any new patent applications." BLM, *Patents* (last visited Feb. 12, 2024).[5]

**C.     Congress protected the wilderness areas adjacent to Grand Canyon National Park.**

52.     The Kanab Creek Wilderness and the Saddle Mountain Wilderness are adjacent to the north of Grand Canyon National Park.

53.     The Kanab Creek Wilderness consists of 70,460 acres.  Bureau of Land Management, *Kanab Creek Wilderness* (last visited Feb. 12, 2024)[6]; *see also* Pub. L. No. 98-406, 98 Stat. 1492, § 301(a)(3) (reserving 77,100 acres as the "Kanab Creek Wilderness—Proposed").

54.     The Kanab Creek Wilderness has been protected since 1984 as wilderness under the Arizona Wilderness Act of 1984.  *Id.*; Pub. L. No. 98-406, 98 Stat. 1492, § 301(a)(3).

55.     The Saddle Mountain Wilderness consists of 40,600 acres.  § 301(a)(8).

56.     The Saddle Mountain Wilderness has been protected since 1984 as wilderness under the Arizona Wilderness Act of 1984.  *Id.*

57.     Only Congress can create wilderness areas.  16 U.S.C. § 1131.

58.     New mining claims have been prohibited in federal wilderness areas since January 1, 1984.  16 U.S.C. § 1133(d)(3).

**D.     Congress has the sole power to declare most federal land designations.**

59.     As previously mentioned, only Congress can declare National Parks, National Forests, and Wilderness Areas.  *See* U.S.C. Title 16; 16 U.S.C. § 1131.

60.     Only Congress can declare National Historical Parks.  *See* U.S.C. Title 16.

61.     Only Congress can declare National Conservation Areas.  *See id.*

62.     Only Congress can declare National Military Parks.  *See* 16 U.S.C. § 422 *et*

---

[5]     *Available at* https://www.blm.gov/programs/energy-and-minerals/mining-and-minerals/locatable-minerals/patents.

[6] *Available at* https://www.blm.gov/visit/kanab-creek-wilderness.

seq.

63.    Only Congress can declare National Seashore Recreational Areas.  *See* 16 U.S.C. § 459 *et seq.*

64.    Only Congress can declare National Scenic Riverways.  *See* 16 U.S.C. § 460m *et seq.*

65.    Only Congress can declare National Rivers. *See* 16 U.S.C. § 460m-8 *et seq.*

66.    Only Congress can declare National Recreation Areas. *See* 16 U.S.C. § 460n *et seq.*

67.    Only Congress can declare National Lakeshores.  *See* 16 U.S.C. § 460s *et seq.*

68.    Subject to obtaining claims, patents, and complying with other federal laws, regulations, and requirements, mining is allowed on federal land that is not designated as a federal national park or a federal wilderness area.

69.    Congress's power over federal land is derived from the Property Clause of the U.S. Constitution, Art. IV, § 3, cl. 2, and must be exercised consistent with principles of federalism and respect for the "balance of federal and state powers" as a matter of constitutional design.  *Bond v. United States*, 572 U.S. 844, 858 (2014) (quotations omitted).

## II.    Arizona State Trust Land, including near the Grand Canyon, funds schools in Arizona.

70.    In addition to the federal land around the Grand Canyon, Arizona possesses State Trust Land in the area near the Grand Canyon.

71.    State Trust Land has been part of the fabric of Arizona since its creation as a Territory.

72.    President Lincoln and Congress established the Territory of Arizona during the middle of the Civil War.  12 Stat. 664, 664–65 (1863).

73.    At the time it established the Territory of Arizona, the federal government granted sections 16 and 36 of each township to Arizona as public lands for the benefit of

"Common Schools."  Ariz. State Land Dep't, *History of Arizona State Trust Land* (last visited Feb. 12, 2024).[7]

74.    Nearly 50 years later, after 200,000 people had moved to the Territory, Arizona prepared to enter the union as a State in 1910.  *See* 2 Dep't of Commerce, *Thirteenth Census of the United States Taken in the Year 1910*, at 66 (1910).

75.    The Arizona-New Mexico Enabling Act of 1910 provided the process for Arizona to become the 48th state.

76.    The Arizona-New Mexico Enabling Act set aside additional public lands— sections 2 and 32 in every township not otherwise appropriated—to the new State of Arizona for the benefit of common schools.  36 Stat. 557, 572 (1910).

77.    Together, sections 2, 16, 32, and 36 granted to the State of Arizona are "State Trust Land."

78.    As required in the Enabling Act, which is incorporated into Arizona's Constitution, Arizona holds "those granted lands in trust" for the purposes set out in those laws. *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 626 (1989).

79.    In total, the United States granted 10,790,000 acres—about 15 percent of the land in the State—to Arizona as State Trust Land.  *Lassen v. Arizona ex rel. Arizona Highway Dep't*, 385 U.S. 458, 460 (1967).

80.    The Arizona-New Mexico Enabling Act allowed State Trust Land to return to the federal government in two situations.

81.    First, at the request of the United States Secretary of the Interior, the State shall relinquish State Trust Land "needed for irrigation works in connection with any government project."  36 Stat. at 574-75; *see also* Ariz. Const. art. 10, § 5.

82.    Second, the Arizona-New Mexico Enabling Act reserved to the United States and excepted from the grant of State Trust Land "all land actually or prospectively valuable for the development of water powers or power for hydro-electric use or transmission." *Id.* This land had to be ascertained and designated by the Secretary of the Interior within five

---

[7] *Available at* https://land.az.gov/our-agency-mission/history-trust-land.

1    years of when the President declared Arizona admitted as a state.  36 Stat. at 575; *see also*
2    Ariz. Const. art. 10, § 6.

3        83.    President Taft declared Arizona a state on February 14, 1912, meaning the
4    hydro-electric power reservation expired on February 14, 1917.  *See* 37 Stat. 1728, 1729
5    (1912).

6        84.    The Arizona Constitution allows all State Trust Land to be sold or leased in
7    the manner allowed by the Arizona-New Mexico Enabling Act, the Arizona Constitution,
8    and the laws of the State of Arizona.  Ariz. Const. art. 10, § 9.

9        85.    The Arizona Constitution empowers the Arizona State Legislature to provide
10   laws for the sale or lease of all State Trust Land: "The legislature shall provide by proper
11   laws for the sale of all state lands or the lease of such lands, and shall further provide by
12   said laws for the protection of the actual bona fide residents and lessees of said lands,
13   whereby such residents and lessees of said lands shall be protected in their rights to their
14   improvements (including water rights) in such manner that in case of lease to other parties
15   the former lessee shall be paid by the succeeding lessee the value of such improvements
16   and rights and actual bona fide residents and lessees shall have preference to a renewal of
17   their leases at a reassessed rental to be fixed as provided by law."  Ariz. Const. art. 10,
18   § 10.

19       86.    The Arizona Constitution requires the Arizona State Legislature to provide a
20   process by law for exchanging State Trust Land.  Ariz. Const. art. 10, § 12.

21       87.    The Arizona Constitution requires the Treasurer to deposit money "derived
22   from any" State Trust Land into a "permanent fund corresponding to the grant under which
23   the particular land producing such monies was, by the enabling act, conveyed or
24   confirmed."  Ariz. Const. art. 10, § 7(A).

25   **III.    Interest groups compromised on the use of federal land around the Grand
26          Canyon in the Arizona Wilderness Act of 1984.**

27       88.    Congress enacted the Arizona Wilderness Act of 1984 to designate certain
28   national forest lands in Arizona as wilderness and to remove certain areas from federal

requirements for wilderness study area management. Arizona Wilderness Act of 1984, Pub. L. No. 98-406, 98 Stat. 1485.

89. The bipartisanship and industry cooperation resulting in the Arizona Wilderness Act of 1984 was lauded by the bill's sponsor, former Arizona Representative Mo Udall: "If there is a better example of a wilderness bill which is the product of bipartisan cooperation, and which has been built from the bottom up by those citizens most directly affected by its provisions, then I don't know what that bill is. … Arizonans throughout the State, of widely differing political views and economic interests, rallied to work out their differences to produce a bill that is in everybody's interests." 130 Cong. Rec. 23,935 (Aug. 10, 1984) (Statement of Rep. Udall). Other members of Congress echoed Congressman Udall's sentiments. *See* 130 Cong. Rec. 7,299 (Apr. 2, 1984) (Statement of Rep. McNulty) ("Out of that I think has come a bill which represents, to the highest degree possible, a fairly decent consensus. If politics is as I believe to be the art of compromise and the science of the achievable, then I think H.R. 4704 richly deserves your consideration and your approbation."); 130 Cong. Rec. 7,300 (Statement of Rep. Seiberling) ("[T]he bill contains many wilderness proposals that, by virtue of careful negotiation and compromise on the part of the major interest groups involved, have been crafted to eliminate resource conflicts or other potential problems. As such, the bill appears to enjoy a broad degree of support.").

90. The goal was to allow Arizonans to set the important policy of how federal land in Arizona would be used, not impose it on them from Washington:

> [W]e have been in almost constant discussion and negotiation with environmentalists, miners, timber people, cattlemen, and many, many others in trying to hammer out an acceptable proposal. We made every effort to have this built from the bottom up in Arizona, not imposed on Arizona from Washington. A lot of voices in Arizona said it could never be done. But I think this bill before the House today, while it does not completely satisfy the interest of any group, fairly and adequately addresses the interest of all

1   groups in our State.

2   130 Cong. Rec. 7,304 (Apr. 2, 1984) (Statement of Rep. Udall).

3       91.   The compromises that became the Arizona Wilderness Act of 1984

4   specifically focused on the area known as the "Arizona Strip," which consists of land north

5   of the Grand Canyon.  Forty years ago, the compromises reached on the Arizona Strip

6   provisions of the bill resulted in "a plan with which everyone can live":

7           The introduction of [the Arizona Strip Wilderness Act], as a separate piece

8           of legislation, represents many long months of intense negotiation and the

9           result is a proposal which enjoys unanimous support.  The appeal and success

10          of the strip bill is that it is a product of those who have a direct interest and

11          use of the land in the strip, rather than a congressional mandate.  The diversity

12          of interests among ranchers, miners, timber companies, environmentalists,

13          local governments, and Federal agencies normally would not lend itself to

14          successfully dealing with the wilderness question.  Yet in this case, those

15          same diverse interests proved that with the give and take on the part of all

16          parties involved, a strong consensus resolving the question can be reached.

17          The result of the actions on the strip will be a plan with which everyone can

18          live, strongly facilitating the implementation of land use management.

19  130 Cong. Rec. 7302 (Apr. 2, 1984) (Statement of Rep. Stump).

20      92.   Mining was a specific area that was the subject of negotiation and

21  compromise.  According to then-Arizona Representative John McCain, "Two other major

22  concerns have been the Arizona Mining Association and the Arizona Cattlegrowers.  The

23  chairman has made numerous boundary modifications and excluded a number of areas of

24  importance to these groups."  130 Cong Rec. 7,303 (Apr. 2, 1984) (Statement of Rep.

25  McCain).

26      93.   The goal was to provide certainty for Arizonans about land use moving

27  forward: Representative Udall said he was "[p]roud of a bill that settles the land

28  management question on nearly 3 million acres of public lands for the foreseeable future

14

so that ranchers, miners, timber people, and other users of the land can get on with intelligent planning for their business." 130 Cong. Rec. 7,304-05 (Apr. 2, 1984) (Statement of Rep. Udall).

**IV. Congressional failures to change land use laws lead to temporary administrative actions.**

94.   For about 20 years, the compromise reached in the Arizona Wilderness Act of 1984 remained acceptable to the interest groups that had negotiated it.

95.   Satisfaction with the 1984 compromise began to erode when the price of uranium began to change.

96.   Between 1984 and 2003, the price of uranium stayed below $20 per pound. St. Louis Federal Reserve, *Global Price of Uranium* (last visited Feb. 12, 2024) (using IMF data);[8] Grand Canyon Trust, *Global Price of Uranium, 1980–2020* (Apr. 2, 2021).[9]

97.   Between 2004 and 2007, uranium prices spiked, reaching a peak of $136 per pound in June 2007.  *Id.*

98.   The surging price for uranium led to surging interest in mining uranium.

99.   Northern Arizona is estimated to have at least 2.6 billion pounds of uranium. U.S. Geological Serv., *supra*, at 36.

100.   The developed uranium deposits elsewhere in the United States total 890 million pounds.  *Id.* at 23.

101.   According to the United States Geological Survey, "some of the highest grade uranium ore in this country is believed to be located in the many mineralized breccia pipes scattered across the Grand Canyon region."  *Id.* at 5.

102.   But for reasons such as the prohibition of mining in Grand Canyon National Park and the adjacent Wilderness Areas, an estimated 933.6 million pounds of uranium is in areas around the Grand Canyon where mining was prohibited before 2009.  *Id.*

103.   Instead, the United States imports most of its uranium from foreign countries,

---

[8] *Available at* https://fred.stlouisfed.org/series/PURANUSDM.
[9] *Available at* https://www.grandcanyontrust.org/global-price-uranium-1980-2020.

including hostile powers like Russia and areas of significant unrest, like Niger.  *See* U.S. Energy Info. Admin., *Nuclear Explained: Where Our Uranium Comes From* (last updated Aug. 23, 2023).[10]

104.   Reliance on foreign imports of uranium is especially pronounced in the utility sector.  For example, "[i]n 2018, U.S. nuclear utility operators relied on foreign suppliers for 93.3 percent of their uranium concentrate requirements, 85.5 percent of their uranium hexafluoride requirements, and 97.6 percent of their enriched uranium hexafluoride (UF6) requirements."  Publication of a Report on the Effect of Imports of Uranium on the National Security, 86 Fed. Reg. 41,540, 41,568 (Aug. 2, 2021).

105.   Yet large amounts of uranium on federal land outside Grand Canyon National Park still could be mined.  When the price of uranium surged, 326 million pounds of uranium sat underneath federal land near the Grand Canyon on property that could be claimed, patented, and mined because it was not within Grand Canyon National Park, a Wilderness Area adjacent to Grand Canyon National Park, or other federal property on which mining was prohibited.  U.S. Geological Serv., *supra*, at 36.

106.   One report found that 320 uranium mining claims were staked near the Grand Canyon in 2004.  Between 2006 and 2007, 6,100 uranium mining claims were staked.  Pew Found., *Ten Treasures at Stake: New Mining Claims Plus an Old Law Put National Parks and Forests at Risk* 7 (2011).[11]

107.   By 2009, more than 10,000 mining claims had been staked outside Grand Canyon National Park.  DOI, *Record of Decision Northern Arizona Withdrawal* 3 (2012).[12]

108.   The increased interest in mining led to a change in heart about the compromises reached in the Arizona Wilderness Act of 1984.  From the perspective of

---

[10] *Available at* https://www.eia.gov/energyexplained/nuclear/where-our-uranium-comes-from.php.

[11] *Available at* https://www.pewtrusts.org/-/media/legacy/uploadedfiles/peg/publications/report/1020treasurespdf.pdf.

[12] *Available at* https://webapps.usgs.gov/uraniummine/documents/DOI%20(2012)%20ROD%20Northern%20Arizona%20Withdrawal.pdf.

some opposed to mining, mining now needed to be banned in areas that had been specifically negotiated to allow it in 1984.

109.    Members of Congress proposed the Grand Canyon Watersheds Protection Act of 2008 (H.R. 5583), Grand Canyon Watersheds Protection Act of 2009 (H.R. 644), and the Grand Canyon Watersheds Protection Act of 2011 (H.R. 855).  None of these bills passed Congress, a chamber of Congress, or even a committee of a chamber of Congress.

110.    Because Congress could not pass legislation to change the land designation around the Grand Canyon, in 2009, the Secretary of the Interior unilaterally issued a two-year ban on location and entry on 993,569 acres.  74 Fed. Reg. 35,887 (July 21, 2009).

111.    The area covered by the Secretary's ban closely coincided with the highest concentration of mining claims.  U.S. Geological Serv., *supra*, at 25 fig.2 (reproduced below).



17

112.   In 2011, the Secretary of the Interior exercised his emergency authority to withdraw 1,010,776 acres from location and entry under the 1872 Mining Law for six months.  76 Fed. Reg. 37,826 (June 28, 2011).

113.   In 2012, the Secretary of the Interior withdrew 1,006,545 acres from location and entry under the General Mining Law for 20 years—the maximum period allowed by law—subject to valid existing rights.  77 Fed. Reg. 2,317 (Jan. 17, 2012); 77 Fed. Reg. 2,563 (Jan. 18, 2012).

114.   As a result of the Secretary of the Interior's decision, no new action on mining claims could begin until 2032.

115.   But the Secretary of the Interior's decision was not permanent.  Members of Congress thus continued trying to pass legislation that would permanently change the land designation around the Grand Canyon.  *See* The Grand Canyon Watersheds Protection Act of 2013 (H.R. 1350); The Greater Grand Canyon Heritage National Monument Act of 2015 (H.R. 3882); The Greater Grand Canyon Heritage National Monument Act of 2017 (H.R. 360); The Grand Canyon Centennial Protection Act of 2019 (H.R. 1373, S. 3127); The Grand Canyon Protection Act in 2021 (H.R. 1052, S. 387).

116.   Despite repeated attempts, none of the numerous Grand Canyon bills became law.  Only one bill even passed a committee vote.

117.   As the expiration date for the Secretary of the Interior's 2012 mining pause drew nearer, exasperated advocates sought to circumvent Congress.  They called for use of the Antiquities Act.

**V.     The Antiquities Act of 1906**

118.   The Antiquities Act of 1906 provides the President with limited authority to protect specific objects of historic or scientific interest: "The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments."  54 U.S.C. § 320301(a).

119.    The President must confine the monument to the "smallest area compatible": "The President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."  54 U.S.C. § 320301(b).

120.    Congress understood the Act was narrow and limited.  "Most commentators who have considered the Act and its legislative history have concluded that it was designed to protect only very small tracts of land around archaeological sites."  Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 GA. L. REV. 473, 477 (2003).

121.    In the House report to a bill identical to the Antiquities Act, the House described the bill's scope as "small" and targeted to "interesting relics of prehistoric times":

> There are scattered throughout the Southwest quite a large number of very interesting ruins.  Many of these ruins are upon the public lands, and the most of them are upon lands of but little present value.  **The bill proposes to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times**.

H.R. Rep. No. 59-2224, at 1 (1906) (emphasis added).

122.    The House report relied heavily on an archeologist's memorandum on the historic ruins in the southwestern United States.

123.    The archeologist's memorandum focused on specific objects: "Every cliff dwelling, every prehistoric tower, communal house, shrine, and burial mound is an object which can contribute something to the advancement of knowledge, and hence is worthy of preservation."  *Id.* at 2 (quoting the memorandum).  The archeologist distinguished between areas of scenic beauty, which could be "organiz[ed] into permanent national parks," and areas where property is "temporarily withdrawn and allowed to revert to the public domain after the ruins thereon have been examined."  *Id.* at 3.  Permanent withdrawal of public land would be reserved for national parks: "That the permanent withdrawal of tracts of land from the public domain for the purpose of protecting ruins

thereon would seem to be unnecessary except where the ruins are of such character and extent as to warrant the creation of permanent national parks." *Id.* at 7–8.

124.   On the day the House passed the Antiquities Act, the sponsor of the identical House bill explained the Antiquities Act would make "small reservations" and "not very much" land would be taken off the market in the Western States.

> Mr. STEPHENS of Texas.  I think the bill would be preferable if it covered a particular spot and did cover the entire public domain.
>
> Mr. LACEY.  There has been an effort made to have national parks in some of these regions, but **this will merely make small reservations where the objects are of sufficient interest to preserve them**.
>
> Mr. STEPHENS of Texas.  Will that take this land off the market, or can they still be settled on as part of the public domain?
>
> Mr. LACEY.  It will take that portion of the reservation out of the market.  **It is meant to cover the cave dwellers and cliff dwellers**.
>
> Mr. STEPHENS of Texas.  **How much land will be taken off the market in the Western States by the passage of the bill?**
>
> Mr. LACEY.  **Not very much.  The bill provides that it shall be the smallest area necessary for the care and maintenance of the objects to be preserved**.
>
> Mr. STEPHENS of Texas.  **Would it be anything like the forest-reserve bill, by which seventy or eighty million acres of land in the United States have been tied up?**
>
> Mr. LACEY.  **Certainly not.  The object is entirely different.  It is to preserve these old objects of special interest and the Indian remains in the pueblos in the Southwest, whilst the other reserves the forests and the water courses.**

40 Cong. Rec. 7888 (June 5, 1906) (emphasis added).

125.   "The colloquy shows that Congress enacted the Antiquities Act with the

20

understanding that it would not allow million-acre reservations of the sort that had occurred under the 1891 [forest reserve] law." Richard Henry Seamon, *Dismantling Monuments*, 70 FLA. L. REV. 553, 566-67 (2018).

126. There were failed attempts to expand the objects the President could declare a monument. For example, the Commissioner of the General Land Office proposed adding "'or natural wonder or curiosity'" to the legislation's protection. Robert Claus, *Reference Service Report: Information about the Background of the Antiquities Act of 1906*, at 12 (1945) (quotations omitted).

127. DOI shared the understanding that the Antiquities Act was narrow and designed to preserve historic objects, not landscapes. In its annual report published the year Congress passed the Antiquities Act, the DOI explained: "After a long and only partly successful struggle to stem the tide of vandalism, **which was gradually destroying the most interesting relics of ancient art and architecture in this country**, effective Federal legislation has been procured 'For the preservation of American antiquities. … Before the passage of this act the Office had kept up an earnest effort to prevent, by such means as lay within its reach, **the despoliation of relics on Indian reservations**." DOI, *Annual Reports of the Department of the Interior 1906, Indian Affairs* 35–36 (1906) (emphasis added).

128. In contrast to the limited scope of the Antiquities Act, that same report discussed a separate bill creating the Mesa Verde National Park to protect its beautiful scenery: "This covers the cliff dwellings in the Southern Ute Reservation, in many respects the most extensive, characteristic, and beautiful in the whole country." *Id.* at 38.

129. In 1911, the Chief Clerk of the General Land Office confirmed that scenery could not be protected by the Antiquities Act: "I have at times been somewhat embarrassed by requests of patriotic and public-spirited citizens who have strongly supported applications to create national monuments out of scenery alone. In many persons the artistic and scientific powers are happily blended, **but the terms of the monument act do not specify scenery, nor remotely refer to scenery, as a possible raison d'être for a public reservation. Reserves of this character may be created by special acts of**

**Congress**."   Frank Bond, The Administration of National Monuments (1911), *in* DOI, *Proceedings of the National Park Service Conference*, 81 (1911) (emphasis added).

130.   The United States continued with the view that the Antiquities Act protected historic objects, not scenery, in an internal report in 1945 on the law's background: "[T]he Department urged that the law be broad enough to include natural wonders or curiosities, springs of medicinal or other value, and areas of scenic interest as well as aboriginal ruins and relics.   **That the bill as finally passed covered only 'historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest' was probably a concession to political expediency.**"   Claus, *supra*, at 1 (emphasis added).

131.   This legislative history and these contemporaneous sources clearly demonstrate that the Antiquities Act was designed to protect landmarks, structures, and objects, not scenery.

132.   It also establishes that "historic landmarks, historic and prehistoric structures, and other objects of historic and scientific interest" have fixed, objective meanings that the President cannot change.

133.   Those facts, as well as numerous other canons of statutory construction, show that "Congress did not have in mind authorizing withdrawals of vast areas for designation as national monuments when it passed the Antiquities Act.  The purpose was to set aside minimal areas to protect ruins of archaeological interest in the American Southwest." David H. Getches, *Managing the Public Lands: The Authority of the Executive to Withdraw Lands*, 22 Nat. Res. J. 279, 301-02 (1982).

## VI.   President Biden's Proclamation Establishing the Ancestral Footprints Monument

134.   On August 8, 2023, President Biden established the Baaj Nwaavjo I'tah Kukveni-Ancestral Footprints of the Grand Canyon National Monument (the "Ancestral Footprints Monument").  Proclamation 10606 of August 8, 2023, 88 Fed. Reg. 55,331 (Aug. 15, 2023) (the "Proclamation").   The Proclamation is incorporated into this complaint by reference.

**A.      Size of the Ancestral Footprints Monument**

135.    The Ancestral Footprints Monument encompasses approximately 917,618 acres divided into three areas.  88 Fed. Reg. at 55,338–39.

136.    The vast scope of the Ancestral Footprints Monument is evident on a map prepared by the United States Department of the Interior; the Bureau of Land Management, Arizona State Office; the United States Department of Agriculture; and the United States Forest Service, Kaibab National Forest.  The Ancestral Footprints Monument is outlined in red and closely tracks the 2009 and 2012 temporary administrative withdrawals by the Secretary of the Interior.



137.   The Ancestral Footprints Monument is comparable to the size of the State of Rhode Island.

138.   The Ancestral Footprints Monument is larger than all but 13 national parks. It is 150,000 acres larger than Yosemite National Park.  It is also more than 75,000 acres larger than the Great Smoky Mountains and Grand Teton National Parks—combined.

139.   Central Park in New York City would fit inside the Ancestral Footprints Monument almost 1,100 times.  Britannica, *Central Park* (Nov. 30, 2023).[13]

140.   For perspective, the National Park Service has identified 28 monument designations in Arizona in the 1900s that together totaled 867,709.90 acres (the sizes of four monument designations were not calculated).  Nat'l Park Serv., *National Monument Facts and Figures* (last visited Feb. 12, 2024).[14]

**B.    The Items the Biden Administration Said Could be Declared to Be National Monuments.**

141.   The Antiquities Act says only certain items can be declared to be national monuments: historic landmarks, historic or prehistoric structures, or "other objects of historic or scientific interest."  54 U.S.C. § 320301(a).

142.   The Proclamation relies on the last category—"objects of historic or scientific interest."  *See* 88 Fed. Reg. at 55,338 ("whereas" clauses).

143.   The Proclamation says that the "entire landscapes within the boundaries of each area reserved by this proclamation are themselves objects of historic and scientific interest in need of protection" and so can be monuments.  *Id.* at 55,338; *see id.* at 55,332 ("While the greater Grand Canyon region is indisputably a cultural resource in its entirety, the landscapes in these three discrete areas are themselves historically and scientifically significant.").

144.   Besides landscapes, the Proclamation identified certain other objects within

---

[13] *Available at* https://www.britannica.com/place/Central-Park-New-York-City.
[14] *Available at* https://www.nps.gov/subjects/archeology/national-monument-facts-and-figures.htm.

the landscape as "objects of historic or scientific interest."  These include:

    a.  Hydrologic features, especially groundwater dynamics.  *See id.* at 55,334–35.  This appears to include potentially one aquifer, *see id.* at 55,335, the groundwater itself, *see id.* at 55,334, and other objects that are related to the flow of water such as caves, cliffs, and other formations, *see id.* at 55,335.

    b.  Geological features, such as the House Rock Valley and Coconino Plateau. *Id.* at 55,335.

    c.  Ecological transitions, "ranging from the Mojave Desert and riparian habitats at low elevations; to Great Basin grassland, Great Basin woodland, and Great Basin desert scrubland at intermediate elevations; to Rocky Mountain subalpine conifer forests, subalpine grasslands, and montane conifer forests at higher elevations.  Ponderosa pine stands, some with old growth characteristics, can also be found at higher elevations." *Id.* at 55,335.

    d.  Animals, plants, habitats, ecosystems, and migration trails.  The Proclamation, for example, references roughly sixty different plant and animal species.

    e.  Broadly defined study areas that include, not just archeological research, but "the relationship between historic climate change and human occupation, including how climate changes affected construction techniques by the Indigenous peoples in the region, the viability of farming, the use of fire, and available resources." *Id.* at 55,334.

145.  That is not an exhaustive list.  The Biden Administration's intent was to include objects "regardless of whether they are expressly identified as objects of historic or scientific interest in the text of this proclamation." *Id.* at 55,338.

146.  Indeed, the Proclamation says that the monument is the landscape and everything in them:  "I find that the unique historic and scientific characteristics of the landscapes, and the collection of objects and resources therein, make the landscapes more than the mere sum of their parts, and thus the entire landscapes within the boundaries of

each area reserved by this proclamation are themselves objects of historic and scientific interest in need of protection under section 320301 of title 54, United States Code." *Id.*

147.   It is not even possible to determine what, or how many, objects besides the landscapes are monuments.  As noted, the Proclamation says it includes objects "regardless of whether they are expressly identified as objects of historic or scientific interest in the text of this proclamation." *Id.* at 55,338.

148.   The Proclamation also claims that "[s]ome of the objects in these areas are sacred to Tribal Nations; are sensitive, rare, or vulnerable to vandalism and theft; or are unsafe to visit.  Therefore, revealing their specific names or locations could pose a danger to the objects or to the public." *Id.* at 55,332.  And it later directs Secretary of the Interior and Secretary of Agriculture to protect "Indigenous Knowledge or other information relating to the nature and specific location of cultural resources within the monument and, to the extent practicable," limit disclosure of information about "nature and specific location of cultural resources within the monument." *Id.* at 55,341.   Because the Proclamation's intent is to include objects "regardless of whether they are expressly identified as objects of historic or scientific interest in the text of this proclamation," *id.* at 55,338, it includes "objects" unidentified by the Defendants.

**VII.   The Proclamation Serves Purposes Beyond Preserving Antiquities.**

149.   The Proclamation, and statements by government officials—including President Biden—indicate that the goal in creating the Ancestral Footprints Monument went far beyond preserving Antiquities.

150.   First, on information and belief, the Proclamation was intended to address historical federal actions toward Native Americans and to preserve the land for their use.

151.   The Proclamation's introduction says that "[t]he history of the lands and resources in the Grand Canyon region also tells a painful story about the forced removal and dispossession of Tribal Nations and Indigenous peoples."  88 Fed. Reg. at 55,331.  And in a press release announcing the designation, the White House said the Proclamation "recognizes and is a step toward addressing the history of dispossession and exclusion of

Tribal Nations and Indigenous peoples in the area." Ex. 1, at 3.

152.    Indeed, the Proclamation indicates that Native American's cultural and religious value of the land is an object that could be designated as a monument. *See*, *e.g.*, 88 Fed. Reg. at 55,332 ("The landscapes are also integrally connected to the Indigenous Knowledge amassed by the Tribal Nations and Indigenous peoples in the area over countless generations."). It references "areas [that] lie within the homelands of numerous Tribal Nations … who describe the lands here as a cultural landscape to which their ancestors belong. The surrounding plateaus, canyons, and tributaries of the Colorado River are central and sacred components of the origin and history of multiple Tribal Nations …. Many Tribes note that their ancestors are buried here and refer to these areas as their eternal home, a place of healing, and a source of spiritual sustenance. Like their ancestors, Indigenous peoples continue to use these areas for religious ceremonies; hunting; and gathering of plants, medicines, and other materials, including some found nowhere else on Earth." *Id.* at 55,333.

153.    On information and belief, this purpose extends to giving local Native American tribes a role in managing the Ancestral Footprints Monument.

154.    In its press release announcing the Proclamation, the Administration said that the monument would incorporate "Indigenous Knowledge and robust Tribal consultation into planning and decision-making." Ex. 1, at 2. It went on to say the Proclamation "directs the Department of the Interior and Department of Agriculture to engage with Tribes … to ensure that the management of the monument occurs in collaboration with Tribes and reflects the Indigenous Knowledge and special expertise Tribes have amassed over countless generations." *Id.* at 4.

155.    The Proclamation achieves that by saying Haaland and Vilsack, who manage the Ancestral Footprints Monument via BLM and the Forest Service, "shall, to the maximum extent practicable, carefully incorporate the Indigenous Knowledge or special expertise offered by Tribal Nations and work with Tribal Nations to appropriately protect that knowledge." 88 Fed. Reg. at 55,340.

156.   The Secretaries are also directed to "explore opportunities for Tribal Nations to participate in co-stewardship of the monument . . . .   The Secretaries shall further explore opportunities for funding agreements with Tribal Nations relating to the management and protection of traditional cultural properties and other culturally significant programming associated with the monument." *Id.*

157.   The Proclamation creates the Baaj Nwaavjo I'tah Kukveni—Ancestral Footprints of the Grand Canyon Commission.   The Commission consists "of one elected officer each from any Tribal Nation with ancestral ties to the area that has entered a cooperative agreement or similar arrangement with the Secretaries, through the BLM or Forest Service, in which the Tribal Nation and the Secretaries agree to co-stewardship of the monument through shared responsibilities or administration," and is directed "to provide guidance and recommendations on the development and implementation of the management plan and on the management of the monument." *Id.*

158.   Moreover, Haaland and Vilsack are directed to "meaningfully engage the Commission"—or, if the Commission does not exist, "the relevant Tribal Nations"—"in the development of the management plan and to inform the subsequent management of the monument.   To that end, the Secretaries shall, in developing, revising, or amending the management plan, carefully and fully consider integrating the Indigenous Knowledge and special expertise of the members of the Commission or comparable entity.   The management plan for the monument shall also set forth parameters for continued meaningful engagement with the Commission or comparable entity in the implementation of the management plan." *Id.* at 55,340–41.

159.   Second, on information and belief, the Proclamation was to prevent mining in the area.

160.   That conclusion is consistent with public reporting on the monument.  *See, e.g.*, Coral Davenport and Lisa Friedman, *Biden Is Expected to Permanently Block Grand Canyon Mining*, THE NEW YORK TIMES, Aug. 4, 2023 ("President Biden is likely to announce the creation of a new national monument to protect about a million acres of land

around the Grand Canyon from uranium mining as soon as next week, according to three people familiar with the matter.");[15] Timothy Puko, *Biden expected to create Grand Canyon national monument to block new mining, sources say*, THE WASHINGTON POST, Aug. 4, 2023 ("President Biden is leaning toward designating a vast area near the Grand Canyon as a national monument to safeguard it from uranium mining, according to five people familiar with the plans.");[16] *see also Grand Canyon Tribal Coalition Celebrates Baaj Nwaavjo I'tah Kukveni – Ancestral Footprints of the Grand Canyon National Monument Designation*, Aug. 8, 2023, *2 ("Many of us have worked for decades to safeguard our Grand Canyon homelands from desecration at the hands of extractive, harmful operations like uranium mining, and today, with the designation of Baaj Nwaavjo I'tah Kukveni - Ancestral Footprints of the Grand Canyon National Monument, we see these lands permanently protected at last.").[17]

161.    The Proclamation contrasts the Federal Government's prior permission and encouragement of "intensive resource exploration and extraction to meet the needs of the nuclear age" and the work of "Tribal Nations and Indigenous peoples . . . to protect the health and wellness of their people and the lands, waters, and cultural resources of the region from the effects of this development, including by cleaning up the abandoned mines and related pollution that has been left behind."  88 Fed. Reg. at 55,331–32.  The inference is that the Proclamation is intended to protect Tribal lands in response to historical federal actions rather than protect specific historical monuments of scientific interest.

162.    Further supporting that inference is the long history of failed congressional actions to end or limit mining in lands within Ancestral Footprints Monument.  *See* Nat. Res. Comm. Democrats, *History of Efforts to Protect the Grand Canyon* (last visited Feb.

[15]    *Available at* https://www.nytimes.com/2023/08/04/climate/biden-grand-canyon-mining-monument.html.

[16]    *Available at* https://www.washingtonpost.com/climate-environment/2023/08/04/arizona-national-monument-uranium-mining/.

[17]    *Available at* https://keepitgrandaz.org/wp-content/uploads/2023/08/GrandCanyonTribalCoalition_PR.pdf.

1      12, 2024).[18]

2          163.   Indeed, many advocates of congressional action to stop mining praised the

3      Ancestral Footprints Monument, and indicated that it accomplished what they wished to

4      do through the failed legislation.  *See*, *e.g.*, Press Release, Rep. Raul Grijalva, Ranking

5      Member Grijalva Hails New Baaj Nwaavjo I'tah Kukveni – Ancestral Footprints of the

6      Grand Canyon National Monument, Thanks Tribes for Tireless Efforts (Aug. 8, 2023);[19]

7      Press Release, Sen. Mark Kelly, Sen. Kelly Statement on National Monument Designation

8      Near Grand Canyon (Aug. 8, 2023);[20] Press Release, Rep. Reuben Gallego, Gallego

9      Applauds Biden for Establishing the Baaj Nwaavjo I'Tah Kukveni – Ancestral Footprints

10     of the Grand Canyon National Monument (Aug. 8, 2023);[21] Rep. Greg Stanton

11     (@RepGregStanton), Twitter (Aug. 8, 2023, 2:13 PM).[22]

12     **VIII.   The Harms the Proclamation Inflicts on Plaintiffs**

13         164.   The Ancestral Footprints Monument has inflicted, and continues to inflict,

14     specifically identifiable harm on Plaintiffs.

15     **A.      The Harmful Effects of the Proclamation on State Trust Land**

16         165.   Arizona statute "directs that proceeds from trust lands and the sale of natural

17     products from such lands, such as timber, minerals, or gravel, shall be deposited into the

18     permanent state school fund."  *Rumery v. Baier*, 294 P.3d 113, 115 (Ariz. 2013) (citing

19     Ariz. Rev. Stat. § 37–521(A)); *see also id.* at 114 ("Arizona's Constitution directs that

20     'whenever any monies shall be in any manner derived from' state trust lands, the monies

21     ─────────────────

22     [18]                    *Available                    at*                    https://democrats-
       naturalresources.house.gov/imo/media/doc/history_of_efforts_to_protect_the_grand_can
23     yon.pdf.

24     [19]   *Available   at*   https://grijalva.house.gov/ranking-member-grijalva-hails-new-baaj-
       nwaavjo-itah-kukveni-ancestral-footprints-of-the-grand-canyon-national-monument-
25     thanks-tribes-for-tireless-efforts/.

26     [20]   *Available   at*   https://www.kelly.senate.gov/newsroom/press-releases/sen-kelly-
       statement-on-national-monument-designation-near-grand-canyon/.

27     [21]   *Available   at*   https://rubengallego.house.gov/media-center/press-releases/gallego-
       applauds-biden-establishing-baaj-nwaavjo-itah-kukveni-ancestral.
28     [22] *Available at* https://twitter.com/RepGregStanton/status/1689006968399335424.

'shall be deposited' into a permanent fund to serve the purpose for which the land was granted.") (quoting Ariz. Const. art. 10, § 7(A)).

166.    The Arizona State Treasurer is responsible for all investment activities of the Permanent Land Endowment Trust Fund.  Ariz. Const. art. 10, § 7(C).

167.    The Proclamation establishing the Ancestral Footprints Monument does not specifically address State Trust Land, but it nevertheless has a significant impact on it.

168.    Parcels of State Trust Land are surrounded by the Ancestral Footprints Monument.

169.    The Proclamation isolates that land by preventing "entry" into the Ancestral Footprints Monument, *see* 88 Fed. Reg. at 55,339, and so reduces their value.  For example, the Proclamation includes a strict prohibition on motor vehicle use unless on an existing road or trail and air travel over the withdrawn lands.  *See id.* at 55,341.

170.    On information and belief, there will be additional restrictions on entry.

171.    The Proclamation prohibits development and construction in the Ancestral Footprints Monument, including areas surrounding State Trust Land.  *See id.*  Any additional construction must be "consistent with the proper care and management of the objects identified" in the Proclamation.  *Id.* at 55,341.  That also reduces the value of State Trust lands and impacts the beneficiaries, including Arizona's schools.

172.    The Proclamation's severe limitations on entry onto the land will affect Arizona's ability to maintain State Trust Lands.  At a minimum, it will make it more expensive.

173.    The Proclamation also gives warning "to all unauthorized persons not to appropriate, injure, destroy, or remove *any feature of the monument* and not to locate or settle upon any of the lands thereof." *Id.* at. 55,342 (emphasis added).

174.    Indeed, the creation of the Ancestral Footprints Monument automatically imposes criminal liability on individuals who violate certain existing regulations applicable to monument land, 54 U.S.C. § 320105, or "injures[ ] or destroys any … monument," 18 U.S.C. § 1866(b).  The threat of such penalties further deters individuals from attempting

31

to access or develop State Trust Lands, thus decreasing their value.

175.   Those are just some examples.   The Ancestral Footprints Monument will restrict and prohibit uses on State Trust Land by making State Trust Land inaccessible, impacting water rights, prohibiting new mining claims, prohibiting new grazing leases, limiting new construction of infrastructure and other property improvements, and affecting other uses of State Trust Land that had previously been allowed.

176.   In short, the Ancestral Footprints Monument will significantly reduce the value of surrounding land, including State Trust Land.

**B.   The Proclamation's Interference with Mining Interests**

177.   In 2012, the Secretary of the Interior withdrew the area encompassed by the Ancestral Footprints Monument, plus a little more—1,006,545 acres in all—from location and entry under the General Mining Law for 20 years, subject to valid existing rights.   77 Fed. Reg. 2,317 (Jan. 17, 2012).

178.   As a result of the Secretary of the Interior's decision, no new action on mining claims could begin until 2032.

179.   The Ancestral Footprints Monument makes permanent the ban on new mining within the monument.   *See* 88 Fed. Reg. at 55,339 ("All Federal lands and interests in lands within the boundaries of the monument are hereby appropriated and withdrawn … from location, entry, and patent under the mining laws; and from disposition under all laws relating to mining and geothermal leasing.").

180.   Mining generates fees and tax revenue for the State of Arizona and Mohave County.   For example, mining companies contribute taxes to the state, county, and local governments.   Based on the location of the mine, additional taxes may be imposed on mining companies to support fire districts, flood control districts, K-12 schools and community colleges.   Because taxes are often distributed equally among all parties to fund specific government functions, diminishing the tax contribution from the mining operations will simply shift the tax burden to other parties or require governments to cut necessary services.

181.    Uranium mining is also economically beneficial to the local community.  For example, a 2009 study indicated that uranium mining would provide a $29 billion benefit to local economies in Northern Arizona and Southern Utah, like Mohave County, over 42 years.

182.    Uranium mining is also critical for ensuring power provision for the State.

183.    A significant portion of energy produced and consumed in Arizona comes from nuclear power.  In 2022, for example, 29 percent of Arizona's total electricity net generation came from nuclear power.  U.S. Energy Info. Admin., *Arizona: State Profile and Energy Estimates* (last visited Feb. 12, 2024).[23]  Nuclear electric power was the second largest source of energy consumed in 2021, at 329.9 trillion Btu.  *Id.*

184.    But as noted above, domestic nuclear energy production is dependent on foreign importation of uranium.

185.    That puts this important power supply at risk: "U.S. nuclear electric power generators would not be able to operate at full capacity and would not be able to support critical infrastructure electric power needs if foreign nations, particularly Russia and other former Soviet states, chose to suspend or otherwise end uranium exports to the United States."  86 Fed. Reg. at 41,542.

186.    There is every reason to believe such a risk exists.  Many uranium imports come from companies owned by nations, like Russia, with interests adverse to the interests of the United States and who "leverage" their control over those companies "to further geopolitical ambitions."  *Id.* at 41,563.  Other risks include foreign nations blocking access to uranium imports.  For example, "Russia … possesses the military means to deny U.S. and U.S.-aligned countries access to Kazakh and Uzbek uranium exported through Russian ports, principally on the Baltic Sea."  *Id.* at 41,598.

187.    It logically follows that the Proclamation exacerbates that risk by permanently barring mining from land within the Ancestral Footprints Monument.

**C.    Other Natural Resource Impacts**

---

[23] *Available at* https://www.eia.gov/state/index.php?sid=AZ#tabs-1.

188.   While the Proclamation preserves Arizona's authority over the Ancestral Footprints monument for purposes of fish and wildlife management, *see* 88 Fed. Reg. at 55,342, it does not preserve the State's authority in any other context, including water rights.

189.   The Proclamation thus negatively affects water rights in the region.  While the Proclamation claims not to affect "valid existing water rights of any part," *id.* at 55,339, its designation of the "groundwater dynamics of the region" and the "hydrologic features" of the Monument, including features dependent on groundwater flow as monuments, *see id.* at 55,334, suggests that the groundwater, or at least essential features of the groundwater, are part of the monument.  That creates ambiguity about water rights in the region, including but not limited to the existence of a federal-reserved water right.

**D.     Harms to the Plaintiffs**

190.   Taken together, the Proclamation and the limitations it imposes, and its effect on State Trust Land, on mining interests, and on natural resource ownership inflict a plethora of cognizable harms on the Plaintiffs.

191.   The Legislature has and will suffer harm, which rises to an injury-in-fact, as a result of the Proclamation.

   a.   As a result of the Proclamation, the Legislature will have to divert resources to deal with the effects the Proclamation will have on the State of Arizona.

   b.   As noted above, the Proclamation will affect the State budget in numerous ways.  For example, the natural, logical result of the Proclamation is an increase in the cost of maintaining State Trust Land and a decrease in specific revenue—the revenue Arizona receives from State Trust Lands and the revenue Arizona could receive from mining on the land.

   c.   Changes in costs and revenue are likely to affect budgeting in other areas.  For example, the Legislature can respond to a drop in revenue or an increase in costs by cutting other State services or increasing revenue—a result the Legislature strongly disfavors and that requires significant time and effort to

effect.  Moreover, the loss of State Trust Land revenue will likely result in pressure from other constituencies for the Legislature to provide appropriations to fill in funding gaps.  That will similarly divert important resources from other priorities.

d.  Other costs and diversions will likely arise from the effect the Proclamation has on energy.  As noted above, Arizona relies heavily on nuclear power to meet its energy needs.  And as also discussed above, the Proclamation impairs domestic mining of uranium and so increases and reinforces reliance on foreign imports—which increases the risks and instability of nuclear power as a source of energy.  That harms the Legislature as a consumer of energy by subjecting it to the risk of disruption and subsequent higher prices for alternative power needs.  It harms the Legislature's interest in ensuring the welfare of Arizonans—specifically their welfare in having a consistent, stable supply of energy.  And it will cause the Legislature to divert time and resources to addressing that risk.

e.  The Proclamation will also divert Legislative time and efforts to focus on issues created by the Proclamation.  As an example:  With regards to water rights, the Legislature will be forced to act in response to ambiguity about water rights the Proclamation creates.  That includes, but is not limited to, providing funds to vindicate the State's interest in groundwater rights, investigating and holding hearings on the loss of water resources, and otherwise diverting resources to address this issue because of its importance.  In this session, for example, "[w]ater will ... be a focus for the Legislature amid a severe, long-term drought in the arid southwestern state."  *Arizona Faces a $1 Billion Deficit as the State Legislature Opens the 2024 Session*, AP (Jan. 8, 2024).[24]

---

[24] *Available at* https://www.abc15.com/news/state/arizona-faces-a-1-billion-deficit-as-the-state-legislature-opens-the-2024-session.

f.  A similar diversion arises from the fact the Legislature also has an interest in the management of the Ancestral Footprints Monument.  That interest includes, but is not limited to, ensuring that Arizona fulfills its duty as trustee of State Trust Lands.  Thus, the Legislature will have to divert resources to protect that interest by monitoring the effect the Proclamation will have on State Trust Lands.  That includes devoting resources to publicly commenting on the management plan, seeking information about Monument management from state or federal entities, and passing laws and regulations to address the new legal framework governing the Ancestral Footprints Monument.  The Proclamation will thus result in a significant diversion of resources from other activities.

g.  Moreover, "Arizona holds state trust land in a fiduciary capacity." *Silver v. Babbitt*, 166 F.R.D. 418, 430 (D. Ariz. 1994).  The purpose of the trust is to ensure the "beneficiaries derive the full benefit of the" trust lands.  *Lassen v. Arizona ex rel. Ariz. Highway Dep't*, 385 U.S. 458, 468 (1967).  The Proclamation, however, unlawfully reduces the value of those lands and so deprives the beneficiaries of that benefit.  Because Arizona's trustee status derives from federal law and the State Constitution, *see*, *e.g.*, *Deer Valley Unified School District No. 97 v. Superior Court*, 760 P.2d 537, 538–40 (Ariz. 1988), the Legislature has a duty to sue to protect the State Trust Lands, *see*, *e.g.*, Ariz. Const., art. 2, § 3(B); Ariz. Senate Rule 2(N); Ariz. House of Reps. Rule 4(K).

h.  While "[t]he administration, charge, and control of state land is vested in the state land department," *Berry v. Arizona State Land Department*, 651 P.2d 853, 855 (Ariz. 1982), there is much reason to believe that the Department will not seek to stop the unlawful Proclamation.  The head of the Department is, by law, "appointed by the governor … and shall serve at the pleasure of the governor," Ariz. Rev. Stat. § 37-131(B), though currently the position is

36

not filled by an individual appointed by the governor and confirmed by the Arizona Senate.  And Governor Hobbs publicly urged President Biden to issue the Proclamation, *see Gov. Hobbs Letter to President Biden Supporting Grand Canyon Monument*, Grand Canyon Trust (May 30, 2023),[25] and praised him when he did, *see* News Release, Governor Katie Hobbs Celebrates Grand Canyon National Monument Designation, Meets with Tribal Leaders (Aug. 8, 2023).[26]

i.   The Legislature has a duty and authority to protect the Trust Lands.  *See* Ariz. Const., art. 2, § 3(B); Ariz. Senate Rule 2(N); Ariz. House of Reps. Rule 4(K).

j.   The Legislature also has an interest in not seeing an outlay from the State's general fund.  *Cf. Lassen*, 385 U.S. at 469 ("Arizona must actually compensate the trust in money for the full appraised value of any material sites or rights of way which it obtains on or over trust lands.") (footnote omitted); *Murphy v. Arizona*, 181 P.2d 336, 357 (Ariz. 1947) (noting the legislature appropriated funds to compensate the permanent fund for the loss it incurred on a loan).

k.   The Legislature also has an interest in vindicating its constitutionally-provided role in management and disposition of State Trust Lands—a role that includes setting up the legal structure for the management and disposition of the lands.  *See* Ariz. Const. art. 10, §§ 3, 7, 9, 10, 12.  Unlawful federal action cutting off State Trust Lands—which the Proclamation does— threatens that legislative scheme by undermining the carefully reticulated scheme the Legislature crafted to ensure the State receives the highest value for the State Trust Land.

---

[25] *Available at* https://www.grandcanyontrust.org/gov-hobbs-letter-president-biden-supporting-grand-canyon-monument.
[26] *Available at* https://azgovernor.gov/office-arizona-governor/news/2023/08/governor-katie-hobbs-celebrates-grand-canyon-national-monument.

l.   The Legislature also has a cognizable interest in the federal government removing or encumbering State Trust Land only through congressional action as opposed to unilateral executive action. That ensures the Legislature can exercise its right to speak and to lobby Congress to leave State Trust Lands untouched, thus protecting its underlying rights in those lands.

192.   The Arizona State Treasurer has and will suffer harm, which rises to an injury-in-fact, as a result of the Proclamation.

a.   Treasurer Yee has an interest in vindicating her constitutional and statutory role in ensuring that Arizona receives the highest and best value for its State Trust Lands.

b.   As a result of the Proclamation, Treasurer Yee will have to divert resources to deal with the effects the Proclamation will have on the State of Arizona.

c.   As noted above, the Proclamation will affect funds managed by the Treasurer in numerous ways. For example, the natural, logical result of the Proclamation is an increase in the cost of maintaining State Trust Land and a decrease in specific revenue—the revenue Arizona receives from State Trust Lands.

d.   The Proclamation will also divert the Treasurer's time and efforts to focus on issues created by the Proclamation. As an example: The Treasurer will need to account for increased maintenance costs and decreased revenue from State Trust Land when giving information in writing as to the condition of the state treasury. ARIZ. REV. STAT. § 41-172(A)(6).

e.   A similar diversion arises from the fact the Treasurer also has an interest in the management of the Ancestral Footprints Monument. That interest includes, but is not limited to, ensuring that Arizona fulfills its duty as trustee of State Trust Land. Thus, the Treasurer will have to divert resources to analyzing the effect of the Proclamation on State Trust Lands. That includes publicly commenting on the management plan, seeking information about

Monument management from state or federal resources, and carrying out duties as Treasurer, as chair of the Board of Investment, and as a member of the Selection Board to address the new legal framework governing the Ancestral Footprints Monument.  The Proclamation will thus result in a significant diversion of resources from other activities.

    f.   Moreover, "Arizona holds state trust land in a fiduciary capacity." *Silver*, 166 F.R.D. at 430.  The purpose of the trust is to ensure the "beneficiaries derive the full benefit of the" trust lands.  *Lassen*, 385 U.S. at 468.  The Proclamation, however, unlawfully reduces the value of those lands and so deprives the beneficiaries of that benefit.  Because Arizona's trustee status derives from its Constitution, *see*, *e.g.*, *Deer Valley Unified School District No. 97*, 760 P.2d at 538–40, the Treasurer has a duty to sue to protect the State Trust Lands.

    g.   Treasurer Yee is a consumer of energy for buildings, structures, and more under her purview.  Thus, she is subject to the same risks of power disruption that the Legislature is from the natural consequence of the Proclamation: further degradation of supply of domestic uranium and thus reinforced reliance on foreign imports of uranium by domestic nuclear electricity suppliers.

193.   Mohave County has and will suffer harm, which rises to an injury-in-fact, as a result of the Proclamation.

    a.   The Proclamation affects more than 400,000 acres of land in Mohave County.

    b.   In particular, the Proclamation will result in a loss of tax revenue to Mohave County from reduced mining activities and reduced economic development resulting from the reduced mining activities.

    c.   Moreover, the Proclamation inflicts costs on Mohave County.  The reduced job opportunities from reduced mining activities and reduced economic

development resulting from the reduced mining activities will make it harder to reduce the poverty rate in Mohave County.  Mohave County residents in poverty rely on County services.

d.  Arizona counties are restricted in their ability to take-on debt in the absence of a local election.

e.  The loss of money and increased costs will thus force Mohave County either to cut services or increase revenue, thus using up some of its indebtedness cap or to hold an election.  In either situation, Mohave County must expend resources—either in the form of lost borrowing capacity or expending resources to hold an election, with the attendant risk the measure to increase debt does not pass.

f.  Like the Legislature, Mohave County will have to divert resources to addressing the effects of the Proclamation and management of the Ancestral Footprints Monument.  That includes, but is not limited to, diverting resources to publicly comment on any Monument management plan, seeking information about Monument management from state or federal resources, and passing ordinances and resolutions to address the new legal framework governing the Ancestral Footprints Monument.  The Proclamation will thus result in a significant diversion of resources from other activities.

g.  Mohave County is a consumer of energy for its buildings, structures, and more.  Thus, it is subject to the same risks of power disruption that the Legislature is from the natural consequence of the Proclamation: further degradation of supply of domestic uranium and thus reinforced reliance on foreign imports of uranium by domestic nuclear electricity suppliers.  Mohave County also has an interest in ensuring that residents of the County receive a stable energy supply—which reliance on foreign uranium imports impairs.

194.  Colorado City has and will suffer harm, which rises to an injury-in-fact, as a

result of the Proclamation.

    a.    The Proclamation will result in a loss of tax revenue from reduced mining activities and reduced economic development resulting from the reduced mining activities.

    b.    Moreover, the Proclamation inflicts costs on Colorado City. For example, upon information and belief, Colorado City's water supply comes from the aquifer that runs beneath the Monument. The Monument raises concerns about Colorado City's water supply and will require Colorado City to begin investigating other water supply options in the event that decisions by the Defendants or other federal government actors reduce Colorado City's water supply.

    c.    Like the Legislature, Colorado City will have to divert resources to addressing the effects of the Proclamation and management of the Ancestral Footprints Monument. That includes, but is not limited to, diverting resources to publicly comment on any Monument management plan, seeking information about Monument management from state or federal resources, and passing ordinances and resolutions to address the new legal framework governing the Ancestral Footprints Monument. The Proclamation will thus result in a significant diversion of resources from other activities.

    d.    Colorado City is a consumer of energy for its buildings, structures, and more. Thus, it is subject to the same risks of power disruption that the Legislature is from the natural consequence of the Proclamation: further degradation of supply of domestic uranium and thus reinforced reliance on foreign imports of uranium by domestic nuclear electricity suppliers. Colorado City also has an interest in ensuring its residents of the City receive a stable energy supply—which reliance on foreign uranium imports impairs.

195. Fredonia has and will suffer harm, which rises to an injury-in-fact, as a result of the Proclamation.

a. The Proclamation will result in a loss of tax revenue from reduced mining activities and reduced economic development resulting from the reduced mining activities.

b. Like the Legislature, Fredonia will have to divert resources to addressing the effects of the Proclamation and management of the Ancestral Footprints Monument.   That includes, but is not limited to, diverting resources to publicly comment on any Monument management plan, seeking information about Monument management from state or federal resources, and passing ordinances and resolutions to address the new legal framework governing the Ancestral Footprints Monument.   The Proclamation will thus result in a significant diversion of resources from other activities.

c. Fredonia is a consumer of energy for its buildings, structures, and more. Thus, it is subject to the same risks of power disruption that the Legislature is from the natural consequence of the Proclamation: further degradation of supply of domestic uranium and thus reinforced reliance on foreign imports of uranium by domestic nuclear electricity suppliers.  Fredonia also has an interest in ensuring its residents receive a stable energy supply—which reliance on foreign uranium imports impairs.

196.   The Proclamation caused those harms and an order declaring it void and barring enforcement of it would redress them.   Even an order nullifying part of the Proclamation and barring enforcement of part of it would redress some of these harms.

## CLAIMS FOR RELIEF

### COUNT ONE – Lack of Statutory Authority Under the Antiquities Act – All Defendants

197.   The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

198.   The size and scope of the Ancestral Footprints Monument is a major action that could not lawfully be conducted without proper legal authority.

42

199.   The U.S. Constitution creates a federal government of limited and enumerated powers, and this limitation applies to the Executive Branch.

200.   Any action of the Executive Branch must come from one of two sources of authority: (1) a valid delegation of authority from a statute enacted by Congress, or (2) a direct exercise of one of the President's enumerated powers in Article II. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

201.   A proclamation under the Antiquities Act (1) must be limited to "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" and (2) a reservation of land must be limited to those "parcels of land" that are "confined to the smallest area compatible with the proper care and management of the objects to be protected."   54 U.S.C. § 320301(a)–(b).   The Proclamation fails both requirements.

202.   First, the Antiquities Act does not give Defendants discretion to define what constitutes a historic landmark, historic or prehistoric structure, or other object of historic or scientific interest that can be declared a monument.

203.   In declaring the Ancestral Footprints Monument, Defendants relied solely on the claim that certain items are "objects of historic or scientific interest":

    a.   "[T]hat the unique historic and scientific characteristics of the landscapes, and the collection of objects and resources therein, make the landscapes more than the mere sum of their parts, and thus the entire landscapes within the boundaries of each area reserved by this proclamation are themselves *objects of historic and scientific interest* in need of protection under section 320301 of title 54, United States Code."  88 Fed. Reg. at 55,338 (emphasis added).

    b.   "[T]hat all the objects identified above *are objects of historic or scientific interest* in need of protection under section 320301 of title 54, United States Code, regardless of whether they are expressly identified as objects of historic or scientific interest in the text of this proclamation."  *Id.* (emphasis added).

43

c. "[T]hat the boundaries of the monument reserved by this proclamation represent the smallest area compatible with the proper care and management of the *objects of scientific or historic interest identified* above, as required by the Antiquities Act, including the landscapes within the boundaries of the three areas reserved and, independently, the collection of objects within those landscapes." *Id.* (emphasis added).

204.    Defendants' proclamation establishing the Ancestral Footprints Monument exceeds their authority under the Antiquities Act because it is not limited to historic landmarks, historic and prehistoric structures, or other objects of historic or scientific interest.  That is, what Defendants declared to be monuments in the Proclamation cannot be monuments because they are not protectable within the meaning of the Act.  54 U.S.C. § 320301(a).

205.    The Proclamation thus violates the major questions doctrine.

206.    In the alternative, if the Antiquities Act gives Defendants unreviewable, unlimited discretion to declare that a particular object is a "historic landmark, historic and prehistoric structure, [or] other object[] of historic or scientific interest," *id.*, it is unconstitutional as an improper delegation of legislative power, *see* U.S. Const. art. I, § 1. The Proclamation thus violates the nondelegation doctrine.

207.    Moreover, given the criminal penalties that attach after such a declaration, *see* 18 U.S.C. §1866(b); 54 U.S.C. §320105, there are real due process concerns in giving the President unbridled discretion to declare an entire landscape a protected monument. That permits, for example, the President to declare objects protected monuments "regardless of whether they are expressly identified as objects of historic or scientific interest in the text of this proclamation."  88 Fed. Reg. at 55,338.  The better reading is that the President does not have unbridled discretion to determine whether something fits the monument criteria.

208.    Exacerbating that due process concern is that this Proclamation keeps some objects and their locations a secret, *see* 88 Fed. Reg. at 55,332, and directs the Secretaries

44

of the Interior and Agriculture to do the same, *see id.* at 55,341.

209.   Second, the Proclamation exceeds Defendants' authority under the Antiquities Act because it is not confined to the smallest area compatible with the proper care and management of the objects to be protected.

210.   Indeed, Defendants' failure to properly identify objects that could be designated monuments, and especially his designation of an entire landscape, makes it impossible to determine what is actually "the smallest area compatible with the proper care and management of the objects to be protected." § 320301(b).  That justifies striking the entire Proclamation.

211.   The Proclamation exceeds Defendants' authority because the Antiquities Act does not authorize Defendants to grant Native Americans a role in managing Monument land.

212.   Alternatively, if the Antiquities Act permits such delegations, it is unconstitutional.

213.   To the extent that any item identified in the Proclamation is a valid historic landmark, historic and prehistoric structure, or other object of historic or scientific interest, it was not the motivating factor for the Proclamation, the Proclamation would not have been issued just to protect that object, and so it cannot be severed from the rest of the Proclamation.  The Proclamation is void *in toto* notwithstanding its severability clause. *See* 88 Fed. Reg. at 55,342-43.

**COUNT TWO – Violation of the Arizona-New Mexico Enabling Act – All Defendants**

214.   The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

215.   The Ancestral Footprints Monument encompasses State Trust Land.

216.   The Arizona-New Mexico Enabling Act allowed the United States Secretary of Interior to request State Trust Land for irrigation works projects by February 14, 1917.

217.   The Ancestral Footprints Monument was not a request to the State of Arizona

45

by the Secretary of the Interior, it did not concern property for irrigation works projects, and it was not requested on or before February 14, 1917.

218.    The Arizona-New Mexico Enabling Act reserved State Trust Land for hydroelectric power use or transmission projects.

219.    The Ancestral Footprints Monument is not related to hydroelectric power use or transmission projects.

220.    The Ancestral Footprints Monument restricts and prohibits State Trust Land outside of what is permitted by the Arizona-New Mexico Enabling Act.

221.    The Ancestral Footprints Monument will restrict and prohibit uses on State Trust Land by making State Trust Land inaccessible, impacting water rights, prohibiting new mining claims, prohibiting new grazing leases, limiting new construction of infrastructure and other property improvements, and affecting other uses of State Trust Land that had previously been allowed.

222.    State Trust Land with restricted and prohibited uses is less valuable to the State of Arizona.

223.    The State of Arizona will have more difficulty leasing State Trust Land, and receive less revenue, as a result of the Ancestral Footprints Monument.

224.    The Arizona State Treasurer will have less State Trust Land revenue to deposit in the Permanent Land Endowment Trust Fund as a result of the Ancestral Footprints Monument.

225.    The Arizona State Legislature's statutory scheme for State Trust Land has not been followed by the restrictions and prohibitions of the Ancestral Footprints Monument.

226.    The Arizona State Legislature's future decisions for statutes concerning State Trust Land has been impacted by the Ancestral Footprints Monument.

227.    The Arizona State Legislature's budget decisions will be affected as a result of the Ancestral Footprints Monument.

228.    Defendants lack the power to restrict or prohibit use on State Trust Land

outside of the Arizona-New Mexico Enabling Act.  Only Congress may alter the terms of the trust the Arizona-New Mexico Enabling Act imposes on the State.

## COUNT THREE – Violation of the Arizona Wilderness Act of 1984 – All Defendants

229.    The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

230.    In the Arizona Wilderness Act of 1984, Congress expressly declared that certain lands in the Arizona Strip District should be designated as wilderness and therefore, as components of the National Wilderness Preservation System.

231.    Land designated as wilderness and as components of the National Wilderness Preservation System by Congress in 1984, including the Kanab Creek Wilderness, is included within the Ancestral Footprints Monument.

232.    In the Arizona Wilderness Act of 1984, Congress expressly declared that any land in the Arizona Strip District of the Bureau of Land Management, Arizona that was "not designated as wilderness by [the] Act have been adequately studied for wilderness designation pursuant to section 603 of the Federal Land Policy and Management Act (Public Law 94-579), and are no longer subject to the requirement of section 603(c) of the Federal Land Policy and Management Act pertaining to the management of wilderness study areas in a manner that does not impair the suitability of such areas for preservation as wilderness."  Public Law 98-406, 98 Stat. 1494, at § 304.

233.    Land designated by Congress as not subject to the requirement of section 603(c) of the Federal Land Policy and Management Act is included within the Ancestral Footprints Monument.

234.    When they established the Ancestral Footprints Monument, Defendants changed the designated use for land in conflict with the Arizona Wilderness Act of 1984.

235.    Defendants lack the power to change the designated use for land governed by the Arizona Wilderness Act of 1984.

**PRAYER FOR RELIEF**

Plaintiffs respectfully ask this Court to:

A.    Issue an order and judgment declaring that the Ancestral Footprints Monument violates the separation of powers established by the U.S. Constitution, is unlawful, *ultra vires*, contrary to law, and exceeds Defendants' authority under the Antiquities Act;[27]

B.    In the alternative, declare the Antiquities Act unconstitutional;

C.    Issue an order and judgment declaring that the Ancestral Footprints Monument violates the Arizona-New Mexico Enabling Act;

D.    Issue an order and judgment declaring that the Ancestral Footprints Monument violates the Arizona Wilderness Act of 1984;

E.    Issue an order and judgment declaring that the Ancestral Footprints Monument is unconstitutional;

F.    Permanently enjoin implementation and enforcement of the Ancestral Footprints Monument;

G.    Set aside the Ancestral Footprints Monument;

H.    Award Plaintiffs costs and reasonable attorneys' fees under 28 U.S.C. § 2412; and

I.    Grant any other relief the Court deems just and appropriate.

Dated: February 12, 2024                    Respectfully submitted,

JAMES OTIS LAW GROUP, LLC

*/s/ Justin D. Smith*
Justin D. Smith, Mo. Bar No. 63253*
Michael E. Talent, Mo. Bar. No. 73339*
13321 North Outer Forty Road, Suite 300

---

[27] Plaintiffs do not seek declaratory or injunctive relief against President Biden. *See Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated and remanded,* 583 U.S. 941 (2017).

48

St. Louis, Missouri 63017
(816) 678-2103
Justin.Smith@james-otis.com
*pro hac vice*

*Attorneys for Plaintiffs Arizona State
Legislature, Treasurer Kimberly Yee, Mohave
County, Colorado City, and Fredonia*