Justin D. Smith, Mo. Bar No. 63253*
Michael E. Talent, Mo. Bar No. 73339*
James Otis Law Group, LLC
13321 North Outer Forty Road, Suite 300
St. Louis, Missouri 63017
Telephone: (816) 678-2103
Justin.Smith@james-otis.com

*Attorneys for Plaintiffs Arizona State Legislature, Treasurer Kimberly Yee, Mohave County, Colorado City, and Fredonia*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona State Legislature, by and through the President of the Arizona Senate, Warren Petersen, and the Speaker of the Arizona House of Representatives, Ben Toma; et al.;<br><br>Plaintiffs,<br><br>v.<br><br>Joseph R. Biden, Jr., in his official capacity as President of the United States; et al.;<br><br>Defendants.<br><br>Chris Heaton,<br><br>Plaintiff,<br><br>v.<br><br>Joseph R. Biden, Jr., in his official capacity as President of the United States; et al.;<br><br>Defendants. | Case No. 3:24-cv-08026-SMM<br>*consolidated with*<br>Case No. 3:24-cv-08027<br><br>**Arizona State Legislature Plaintiffs' Opposition to State and Governor of Arizona's Motion to Dismiss** |

**INTRODUCTION**

The Arizona State Legislature, the State Treasurer, Mohave County, Colorado City, and Fredonia (collectively, "Legislature Plaintiffs") challenge the Biden Administration's unilateral and unlawful creation of a national monument spanning more than 900,000 acres in northern Arizona.  As supporters of the Biden Administration's action, Governor Katie Hobbs and the State of Arizona through Attorney General Kris Mayes ("State Intervenors") seek dismissal of this action by incorrectly relabeling injuries suffered by each Legislature Plaintiff as injuries to the State.  However, the State Intervenors' motion fails.

Only one Plaintiff needs to have standing for this lawsuit to proceed.  The State Intervenors do not challenge Plaintiff Chris Heaton's standing.  Because the State Intervenors implicitly concede that one Plaintiff has standing, the Court may disregard the State Intervenors' standing arguments against the Legislature Plaintiffs.

Contrary to the State Intervenors' arguments, the Legislature Plaintiffs seek to redress their own injuries, not injuries sustained by the State.  For example, the Legislature asserts its own institutional injuries caused by the Proclamation's limitations on its legislative authority.  Mohave County, Colorado City, and Fredonia claim the Proclamation will cause them each to lose tax revenue, and Judge Campbell found Mohave County had standing to bring similar claims in a different case.  The Treasurer and other Legislature Plaintiffs allege the Proclamation will cause each to divert their own resources.

The injuries alleged by the Legislature Plaintiffs are concrete and imminent.  The Proclamation's impacts on State Trust Land—prohibitions on new roads, new infrastructure, and aviation access—are in effect today.  The Proclamation's withdrawal of the Monument area from the mineral leasing and geothermal leasing laws has already occurred.  And the Proclamation's permanent changes to the Monument area has reduced the value of State Trust Land, will decrease revenue from its sale or lease, and will decrease tax revenue.  These are real injuries that this Court can redress.

The Legislature Plaintiffs have sufficiently alleged standing.  Thus, the Court should deny the State Intervenor's Motion to Dismiss.

1    **I.      The State Intervenors' Motion Fails If One Plaintiff Has Standing.**

2         "In a suit with multiple plaintiffs, generally only one plaintiff need have standing

3    for the suit to proceed." *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022) (citation

4    omitted).  "This rule has been applied in consolidated cases."  *Ashley Creek Properties,*

5    *L.L.C. v. Larson*, 403 F. App'x 273, 275 (9th Cir. 2010) (citing *Horne v. Flores*, 557 U.S.

6    433, 446 (2009) (involving the Speaker of the Arizona House of Representatives and the

7    President of the Arizona State Senate); *Sec'y of the Interior v. California*, 464 U.S. 312,

8    319 n.3 (1984)).

9         The State Intervenors implicitly concede that Plaintiff Chris Heaton has standing by

10   not challenging subject matter jurisdiction over his claims.  *See* Doc. 73.  The State

11   Intervenors moved "to intervene as defendants in this consolidated lawsuit," Doc. 50, at 2,

12   and the Court ruled that the State Intervenors "are joined as Intervenor Defendants in this

13   action." Doc. 72, at 16.  This consolidated action includes Plaintiff Heaton's claims.  *Cf.*

14   Doc. 50, at 2 n.3 (State Intervenors contacted Plaintiff Heaton regarding their intervention

15   request).  However, the State Intervenors do not even mention Plaintiff Heaton in their

16   Motion to Dismiss.  *See* Doc. 73.

17        A similar strategy proved fatal to standing arguments made by another State's

18   attorney general.  *See Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567 F.3d 521,

19   523 (9th Cir. 2009).  In that case, California's Attorney General and a state agency

20   challenged the standing of two plaintiffs, but not the third plaintiff.  *Id.*  Applying the

21   general rule that "in an injunctive case this court need not address standing of each plaintiff

22   if it concludes that one plaintiff has standing," the Ninth Circuit concluded that the third

23   plaintiff "unquestionably has standing." *Id.*  Accordingly, the Ninth Circuit did not address

24   California's standing challenges to the other two plaintiffs.  *Id.*

25        So too here.  The State Intervenors' failure to challenge Plaintiff Heaton's standing

26   defeats the State Intervenors' standing arguments in this injunctive case.

27

28

1

2

**II.    The Legislature Plaintiffs Have Authority to Pursue Litigation to Remedy Their Own Injuries.**

3

**A.  The Legislature Plaintiffs seek to redress their injuries, not the State's.**

4

5

6

7

8

9

10

11

12

13

14

15

16

The State Intervenors argue that the Legislature Plaintiffs lack standing to pursue litigation based on harms "to the State."  Doc. 73, at 7-10.[1]  This argument rests on a fundamental misunderstanding: the Legislature Plaintiffs do not seek to remedy an injury to the State as a whole.  Instead, their standing rests on injuries each Legislature Plaintiff has sustained or imminently will sustain.  *See, e.g.*, Doc. 1, ¶ 191 (describing specific injuries imposed by the Proclamation on the Legislature); *id.* ¶ 192 (same as to the State Treasurer); *id.* ¶ 193 (same as to Mohave County); *id.* ¶ 194 (same as to Colorado City); *id.* ¶ 195 (same as to Fredonia); Doc. 63, at 13-17 (describing diversion of resource impacts on Legislature Plaintiffs); *id.* at 17-27 (describing water rights impacts on Legislature Plaintiffs); *id.* at 27-33 (describing direct economic impacts on Legislature Plaintiffs); *id.* at 34-35 (describing additional institutional impacts on State Treasurer).  Because all Legislature Plaintiffs seek to redress their own injuries—not injuries sustained by the State[2]—the State Intervenors' arguments lack merit.

17

18

19

20

Arizona law does not support State Intervenors, either.  For example, A.R.S. § 41-193(A)(3), relied upon by the State Intervenors (Doc. 73, at 9), only authorizes the Attorney General to "[r]epresent *this state*" in federal court.  A.R.S. § 41-193(A)(3) (emphasis added).  Because the Legislature Plaintiffs raise claims on their own behalf—not on behalf

21

22

23

24

25

26

[1] As an initial matter, State Intervenors' argument that the Legislature Plaintiffs lack "authority to sue" has no bearing on the Legislature Plaintiffs' *standing*, which is the sole basis for dismissal raised by the Motion to Dismiss.  "The question of a litigant's capacity or right to sue or be sued generally does not affect the subject matter jurisdiction of the district court."  *De Saracho v. Custom Food Machinery, Inc.*, 206 F.3d 874, 878 n.4 (9th Cir. 2000) (quotation omitted).  For that reason, arguments regarding a plaintiff's authority to sue do not provide a basis for dismissal based on standing.  *See, e.g., Cantu v. SAC Int'l Steel, Inc.*, No. 10-cv-547, 2010 WL 11508758, at *2-3 (S.D. Cal. Sept. 2, 2010).

27

28

[2] To be sure, the Proclamation here *does* impose substantial harms on the State as a whole.  But rather than taking vigorous action to prevent those harms, the Attorney General and Governor instead seek to enable them.

of the State as a whole—the statute does not apply.[3]  *See id.*; *see also Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 799-803 (2015) (finding that the Arizona Legislature, represented by its own counsel rather than the Attorney General, had standing to litigate in federal court).

The State Intervenors' reliance on § 41-101(A)(5) is similarly misplaced.  That statute merely provides that the Governor "[s]hall be the sole official means of communication between this state and the government of any other state or the United States."[4]    A.R.S.  § 41-101(A)(5).   This litigation does not reflect an official "communication" with the federal government; it reflects an effort to halt ongoing unlawful conduct by the federal government.  *Cf. State ex rel. MoGas Pipeline, LLC v. Mo. Pub. Serv. Comm'n*, 366 S.W.3d 493, 498-99 (Mo. 2012) (rejecting contention that intervening in litigation involving federal agency constituted "communication" with the federal agency).  By its own terms, then, § 41-101(A)(5) does not apply.

**B.  The Legislature Plaintiffs have authority to bring these specific claims.**

The State Intervenors disagree as a matter of policy with the Legislature Plaintiffs' claims.  But that policy disagreement does not affect the Legislature Plaintiffs' ability to bring these claims because they assert their own injuries, as these examples demonstrate.

---

[3] The Attorney General does not claim that § 41-193(A)(3) requires her to represent any of the Legislature Plaintiffs.  To the contrary, Arizona law expressly authorizes the State Treasurer to retain her own counsel.  *See* A.R.S. § 41-192(D)(9).  In addition, both the House and Senate have authorized the Speaker and President, respectively, to bring litigation on behalf of each Chamber.  *See* House Rule 4(K); Senate Rule 2(N).  The Arizona Constitution grants the House and Senate express authority to adopt their own Rules.  *See Puente v. Arizona State Legislature*, 521 P.3d 1007, 1011 (Ariz. 2022).  These constitutionally authorized Rules constitute provisions of law.  *See, e.g., Reza v. Pearce*, No. 11-cv-1170, 2011 WL 5024265, at *2 (D. Ariz. Oct. 21, 2011) ("Senate rules are analogous to enacted statutes and ordinances.") (holding that the violation of a Senate Rule provided probable cause for an arrest).

[4] Contrary to the State Intervenors' strident rhetoric about the Governor serving as the State's only federal communicator, the Attorney General has communicated with the federal government on behalf of the State.  *See, e.g.*, Letter from State Attorneys General to the White House Office of Gun Violence Prevention, Jan. 9, 2024, *at* https://tinyurl.com/bd4822va ("We write on behalf of the States of . . . Arizona . . . ."); Pet. for an Emergency Temporary Standard to the U.S. Dep't of Labor, Feb. 9, 2024, p. 30, *at* https://tinyurl.com/3fw8rjen ("For the State of Arizona").

1.  *State Trust Land*.  The Proclamation diminishes the Legislature's authority to legislate on State Trust Land.  "After title to [the State Trust Lands] had vested in the state, it became exclusively the province of the state Legislature to provide a method for disposing of them which would further the objects for which the various grants were made . . . ."  *Campbell v. Flying V. Cattle Co.*, 220 P. 417, 418 (Ariz. 1923).  The Arizona Constitution grants the Legislature ultimate authority over State Trust Lands.  *See* ARIZ. CONST. art. X, § 10; *see also* ARIZ. CONST. art. X, § 3.  For example, Article X, § 10 dictates that "[t]he legislature shall provide by proper laws for the sale of all state lands or the lease of such lands, and shall further provide by said laws for the protection of bona fide residents and lessees of said lands, whereby such residents and lessees of said lands shall be protected in their rights to their improvements (including water rights)."  ARIZ. CONST. art. X, § 10.  Article X "is a mandate to the Legislature."  *Campbell v. Muleshoe Cattle Co.*, 212 P. 381, 382 (Ariz. 1923).

As described in the Complaint, the Proclamation imposes onerous restrictions on State Trust Lands in the vicinity of the Monument.  *See* Doc. 1, ¶¶ 165-176; *see also* Doc. 63, at 7-11.  If valid, these restrictions would limit the scope of the Legislature's legislative authority.  *See* U.S. CONST. art. VI, cl. 2.  These diminutions of legislative power would limit the Legislature's ability to control the sale or lease of State Trust Lands.  They would also seriously limit the Legislature's ability to protect the rights and interests (including water rights) of residents and lessees of State Trust Land, as mandated by Article X, § 10.  *See, e.g.*, Doc. 1, ¶ 175; *see also* Doc. 63, at 17-27 (discussing the Proclamation's impact on water rights).  Thus, the Proclamation diminishes the Legislature's authority to legislate on a subject that the Arizona Constitution expressly directs the Legislature to regulate through legislation.  *See* ARIZ. CONST. art. X, §§ 3, 10.  As a result, the Proclamation imposes an institutional injury on the Legislature.

It is well-established that the Legislature has authority to bring litigation to seek redress of its own institutional injuries.  *See, e.g.*, *Forty-Seventh Legislature v. Napolitano*, 143 P.3d 1023, 1027-28 (Ariz. 2006); *see also Arizona State Legislature*, 576 U.S. at 803

6

1   (holding that, as a matter of Article III standing, the Arizona Legislature could sue to seek
2   redress of institutional injuries).  For example, the Legislature sustains an institutional
3   injury when a challenged enactment would limit the Legislature's ability to legislate on a
4   topic that it otherwise would have authority to regulate.  *Toma v. Fontes*, 553 P.3d 881,
5   891 (Ariz. App. 2024) (holding that the Legislature had standing to challenge a provision
6   enacted through initiative petition that would have prevented the Legislature from enacting
7   certain legislation relating to campaign finance); *see also Raines v. Byrd*, 521 U.S. 811,
8   821 (1997) (describing the "diminution of legislative power" as an institutional injury to a
9   legislative body).  The Legislature can pursue litigation to remedy that institutional injury.
10  *See Toma*, 553 P.3d at 891; *Forty-Seventh Legislature*, 143 P.3d at 1027-28.  That is
11  precisely what the Legislature has done here.  All the injuries underlying the Legislature's
12  standing are institutional injuries sustained by the Legislature itself, not by the "State."

13      The institutional injury at issue here mirrors the institutional injury that the Supreme
14  Court found to support the Arizona Legislature's standing in *Arizona State Legislature*.  In
15  that case, the Legislature argued that it was constitutionally vested with "primary
16  responsibility for redistricting."  576 U.S. at 800.  Because the regime at issue "would
17  completely nullify any vote by the Legislature" on that subject matter, the Supreme Court
18  found that the Legislature had sustained an institutional injury sufficient to confer standing.
19  *Id.* at 804.  Similarly here, Article X of the Arizona Constitution grants the Legislature
20  primary responsibility for the sale and lease of State Trust Lands, as well as for the
21  protection of the rights and interests of residents and lessees of those lands.  *See* ARIZ.
22  CONST. art. X, §§ 3, 10.  As described above, the Proclamation, if valid, would completely
23  nullify key legislative action relating to State Trust Lands.  Just as in *Arizona State*
24  *Legislature*, the Legislature has standing here to vindicate its own institutional interests.

25      2.  *Mining*.  The State mischaracterizes the Complaint as asserting claims for only
26  reduced State—and not also local—tax revenue from the Proclamation's effect on mining.
27  Doc. 73, at 8.  However, Mohave County, Colorado City, and Fredonia assert loss of their
28  own tax revenue from reduced mining activities and associated reduced economic

7

development.  *See* Doc. 1, ¶¶ 193(b), 194(a), 195(a).  Indeed, the Attorney General's Office has previously reported that a federal government mining prohibition in the Monument area would have "negative economic impacts" on the economies of northern Arizona that potentially reach into the billions of dollars.  Brief of the States of Utah, Arizona, Montana, and Nevada, Doc. 29, *Nat'l Mining Ass'n v. Jewell*, No. 14-17350 (9th Cir. Apr. 17, 2015), at 5, attached as Exhibit A.  "An expected loss of tax revenue can constitute a sufficient injury for purposes of Article III standing."  *City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (finding city had standing based on expected loss of tax revenue); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004) (same).

Mohave County, Colorado City, and Fredonia have standing under this precedent, as demonstrated by a decision ruling that Mohave County had standing to pursue similar claims against the federal government.  *Yount v. Salazar*, No. CV11-8171-PCT DGC, 2013 WL 93372, at *10-*14 (D. Ariz. Jan. 8, 2013).  Based on allegations that Mohave County's revenue would be "significantly reduced" by the federal government preventing mining on property in northern Arizona, *id.* at *12, Judge Campbell found that the subsequent "economic consequences for Mohave County that will directly impair its ability to carry out its governmental functions . . . shows injury to the County's concrete proprietary interests."  *Id.* at *13; *see also* Doc. 63, at 27-30.

Mohave County, Colorado City, and Fredonia have standing from alleged tax revenue injuries, and they may pursue these injuries now.  *See* Doc. 63, at 30-34.

3.  *Water*.  The State Intervenors again mistakenly claim the Complaint seeks to address water rights held by the State.  Doc. 73, at 9-10.  Not so.  For example, Colorado City alleged injury from the Proclamation's potential impact on its water supply.  Doc. 1, ¶ 194(b).  The Attorney General already has recognized that an "unprecedented water crisis" will require cities and towns—not just the State—to take action to meet their water supply needs.  Brief of Amicus Curiae State of Arizona in Supp. of Pls.' Mot. for Summ. J., Doc. 66-1, *County of Mohave v. U.S. Bureau of Reclamation*, 3:22-cv-08246-MTL (D.

Ariz. Sept. 22, 2023), at 3.[5]  The Proclamation requires Colorado City to take action to protect its water supply.

Colorado City has alleged that it will suffer harm because the Proclamation will require it to investigate other water supply options.  Doc. 1, ¶ 194(b).  In addition, all Legislature Plaintiffs allege that the Proclamation "negatively affects water rights in the region."  *Id.* ¶ 189.  Accordingly, the Legislature Plaintiffs may pursue injuries suffered from the Proclamation's impact on their water rights and water supply.  *Cf. Mono Cnty. v. Walker River Irrigation Dist.*, 735 F. App'x 271, 273 (9th Cir. 2018).

### C. The Legislature Plaintiffs have not implicated the separation of powers.

The State Intervenors repeatedly rely on a single inapposite Arizona Supreme Court decision to warn of separation of powers concerns.  *See* Doc. 73, at 8, 9, and 10 (citing *State ex rel. Woods v. Block*, 942 P.2d 428 (Ariz. 1997)).  In *Block*, the court considered the legality of the Constitutional Defense Council, a three-member body with authority to initiate any litigation "in the name of [the] state" challenging federal action.  *Block*, 942 P.2d 436 (quoting A.R.S. § 41-401(F)).  Legislative appointees held two of the three seats on the Council, and thus the court concluded that the Council was a legislative body.  *Id.* at 434-35.  The court further concluded that "conducting litigation on behalf of the state, as authorized by the Legislature, is an executive function," and thus the Council—as a legislative body—violated the separation of powers by exercising that function.  *Id.* at 436.

The circumstances here are critically different from *Block*.  The Legislature Plaintiffs do not seek to litigate "on behalf of the state."  Instead, as described above, they seek to litigate on their own behalf, seeking redress for their own injuries.  Nothing in *Block* suggests that the Legislature violates the separation of powers when it litigates in its own name to vindicate its own institutional interests.  Such a conclusion would be inconsistent with subsequent Arizona cases that have expressly permitted the Legislature to pursue such litigation.  *See, e.g.*, *Toma*, 553 P.3d at 891; *Forty-Seventh Legislature*, 143 P.3d at 1027;

---

[5] *Available at* https://tinyurl.com/yc79kejd.

*see also Biggs v. Cooper ex rel. Cnty. of Maricopa*, 341 P.3d 457, 460-62 (Ariz. 2014). "Respecting [Arizona's] plans for the distribution of governmental powers . . . serves important national interests." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 192 (2022) (cleaned up). The separation of powers does not preclude the Legislature Plaintiffs from pursuing this litigation.[6]

Indeed, if anything, the State Intervenors' position raises separation of powers concerns. The Legislature and the Executive are separate, coequal branches of state government. *See* ARIZ. CONST. art. 3. If the Legislature could only protect its institutional interests through the Attorney General, then the legislative branch's power would be contingent on the cooperation of the executive branch. It is not uncommon for the legislative and executive branches to adopt conflicting approaches, even to the point of litigation between the two branches regarding their respective institutional interests. *See, e.g.*, *Forty-Seventh Legislature*, 143 P.3d 1023 (litigation between Legislature and Governor regarding validity of veto); *Brewer v. Burns*, 213 P.3d 671 (Ariz. 2009) (litigation between Legislature and Governor regarding presentment of bills). Any rule that would require the Legislature to assert its institutional interests through the Attorney General would be untenable and would violate the separation of powers. Such a rule would also be contrary to deeply entrenched Arizona precedent permitting the Legislature to pursue litigation.

The State Intervenors' arguments lack merit, and the Motion to Dismiss should be denied.

## II.   The Proclamation Imposes Concrete, Imminent Harms on the Legislature Plaintiffs.

The State Intervenors next claim that the harms imposed by the Proclamation are merely "speculative and conjectural." Doc. 73, at 11-12. In particular, they take aim at

---

[6] The State Intervenors do not explain how litigation by the State Treasurer raises separation of powers concerns since she, too, is an executive branch official. *See* ARIZ. CONST. art. V, § 1(A) ("The executive department shall consist of the governor, lieutenant governor, secretary of state, attorney general, state treasurer and superintendent of public instruction, . . .").

four categories of harm: (1) "the potential impact of the Proclamation on the value of, proceeds from, and costs to maintain State Trust Land," *id.* at 11; (2) "potential decreased mining activity, leading to reduced economic development," *id.*; (3) "potential lost tax and other revenue," *id.*; and (4) "potential impact on water rights and the State's water supply," *id.*  The State Intervenors' cursory and conclusory assertions largely rehash arguments made in more detail by the Federal Defendants.  As the Legislature Plaintiffs have explained in depth in their opposition to the Federal Defendants' Motion to Dismiss, each of the injuries at issue is concrete and imminent, and thus sufficient to establish standing. *See* Doc. 63; *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023).

First, the Proclamation will have profound adverse impacts on the vast portions of State Trust Land that are entirely surrounded by the Monument.  *See* Doc. 63, at 7-11.  The Proclamation's prohibitions on new roads and highway corridors will choke off that State Trust Land, effectively preventing new mining and other resource extraction on that land. *See id.* at 7-8.[7]  The Proclamation also effectively prohibits any improvements on that State Trust Land if those improvements would involve new utility, pipeline, or water infrastructure.  *See id.* at 8-9.  The Proclamation also prohibits aviation access to that State Trust Land, except by the military and the Arizona Game and Fish Department.  *See id.* at 9-10.  These draconian restrictions on State Trust Land are not "speculative" or "conjectural": they are in place today.  These substantial limitations on the use and development of State Trust Land necessarily diminish the value of that land and, as a result, revenue generated from that land.  Moreover, these restrictions undermine the rights and interests of existing residents and lessees of State Trust Land—rights and interests that the Arizona Constitution expressly directs the Legislature to protect.  *See* ARIZ. CONST. art. X,

---

[7] The State Intervenors blithely assert that "the Proclamation . . . does not restrict mining on State Trust Land."  Doc. 73, at 11.  While the Proclamation does not *expressly* regulate mining on State Trust Lands, as described above, it renders mining and other resource extraction impossible as a practical matter by prohibiting new roads or infrastructure from crossing the Monument lands that surround the State Trust Land.  The Proclamation necessarily causes a concrete, imminent injury.  It is irrelevant to the standing analysis that it arguably does so indirectly (*i.e.*, by its necessary consequences rather than its express proscriptions).  *See Mendia v. Garcia*, 768 F.3d 1009, 1012-1013 (9th Cir. 2014).

§ 10.  The Proclamation's concrete and imminent adverse impacts on State Trust Land support standing.

Second, the Proclamation will directly decrease mining and other resource extraction and, as a result, reduce economic development.  As noted above, the Proclamation effectively prevents mining on State Trust Land surrounded by the Monument.  *See* Doc. 63, at 7-8.  In addition, the Proclamation also withdraws the Monument land itself from the mining, mineral leasing, and geothermal leasing laws.  *Id.* at 29-30.  These restrictions on mining and other resource extraction will have concrete, imminent adverse impacts on economic development.  *See id.* at 30-35.  Those concrete, imminent harms support standing.

Third, as described above, the Proclamation significantly reduces the value of State Trust Land and will prevent mining and other resource extraction.  Those harms, in turn, result in decreased tax revenue and decreased revenue from the sale or lease of State Trust Land.  *See* Doc. 63, at 10-11, 30-35.

Fourth, the Proclamation will have concrete and imminent adverse effects on water rights that will directly harm each of the Legislature Plaintiffs.  *See id.* at 17-27.  These adverse effects will also harm the water rights of residents and lessees of State Trust Land surrounded by the Monument, which in turn directly implicates the Legislature's constitutional duty to protect the water rights of those residents and lessees.  *See id.* at 25; *see also* ARIZ. CONST. art. X, § 10.  The injuries cited by the State Intervenors—as well as other injuries described in the Complaint—are concrete and imminent, and those injuries thus support standing.

## III.   The Diversion of the Legislature Plaintiffs' Resources Necessitated by the Proclamation Establishes Standing.

The State Intervenors next claim that the diversion of the Legislature Plaintiffs' resources necessitated by the Proclamation is insufficient to establish standing.  Doc. 73, at 12-13.  The core of this argument is that these diversions of resources are "no more than merely 'business as usual.'"  *Id.* (quoting *Am. Diabetes Ass'n v. U.S. Dep't of the Army*,

938 F.3d 1147, 1155 (9th Cir. 2019)).  As the very case cited by the State Intervenors makes clear, however, this argument misses the mark.  The Ninth Circuit has explained that a plaintiff is not "going about their business as usual" when they have "altered their resource allocation" in response to the challenged action.  *Am. Diabetes Ass'n*, 938 F.3d at 1154 (cleaned up).

That is precisely what the Legislature Plaintiffs allege here.  Each Legislature Plaintiff will need to allocate staff time and other resources to activities that they would not have undertaken but for the Proclamation.  *See, e.g.*, Doc. 63, at 13-17; Doc. 1, ¶ 191(b), (c), (d), (e), (f); ¶ 192(b), (d), (e); ¶ 193(f); ¶ 194(c); ¶ 195(b).  These diversions of resources involve each Legislature Plaintiff's own resources, not resources shared with the State as a whole.  *See id.*  The Legislature Plaintiffs do not have unlimited resources, and thus the allocation of their resources to activities compelled by the Proclamation necessarily means that those resources cannot be used to address the numerous pressing issues facing each of the Legislature Plaintiffs.  This diversion of resources constitutes an injury sufficient to establish standing.  *See, e.g.*, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc) (holding that an organization had established standing to challenge an ordinance where "the time and resources spent in assisting day laborers during their arrests [under the ordinance] and meeting with workers about the status of the ordinance would have otherwise been expended toward [the organization's] core organizing activities").

The State Intervenors seemingly claim that, because the Legislature Plaintiffs' broad governmental missions—the Legislature's role of enacting legislation, or the Treasurer's role of managing state funds—remain the same, then there has been no diversion of resources.  *See* Doc. 73, at 12-13.  That argument focuses on the wrong question.  The relevant inquiry is whether the Legislature Plaintiffs have "altered their resource allocation" based on "the challenged practices."  *Am. Diabetes Ass'n*, 938 F.3d at 1154.  As explained above, they have.  The Legislature Plaintiffs have alleged diversion of resources sufficient to establish standing.  *Compare, e.g.*, *Smith v. Pac. Props. & Dev.*

*Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (holding that organization had standing based on diversion of resources where it alleged that it had to divert resources "in order to monitor" the challenged conduct).  The State Intervenors' arguments regarding diversion of resources lack merit.

**IV.   The Legislature Plaintiffs' Injuries Based on Disruption of the Energy Supply Support Standing.**

Finally, the State Intervenors dispute that the disruptions to the energy supply caused by the Proclamation suffice to establish standing.  Doc. 73, at 13-14.  They present two brief arguments, neither of which has merit.

First, the State Intervenors contend that these harms constitute "generalized grievances" because many other energy consumers would experience similar harms.  *Id.* But they misunderstand the applicable standard.  An injury does not constitute a non-justiciable generalized grievance merely because many parties sustain the same injury. "[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact.'" *FEC v. Akins*, 524 U.S. 11, 24 (1998) (rejecting argument that injury constituted generalized grievance).  Widespread injuries become "generalized grievances" only when they involve highly abstract injuries, the quintessential example of which is the "harm to [the plaintiff's] and every citizen's interest in proper application of the Constitution and laws." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (quotation omitted).  The Complaint specifically alleges that the disruption of the energy supply will result in "subsequent higher prices for alternative power needs" for the Legislature Plaintiffs.  Doc. 1, ¶ 191(d); *see also id.*, ¶¶ 192(g), 193(g), 194(d), 195(c).  Financial losses due to increased prices are precisely the "sort of pocketbook injury [that] is a prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. 220, 243 (2021); *see also, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Second, the State Intervenors claim that the disruption of the energy supply resulting from the Proclamation "depends on choices by third parties not before the Court," and thus

the Legislature Plaintiffs have not satisfied the traceability and redressability components of standing.  Doc. 73, at 14.  But standing does not require that a defendant's conduct be the *sole* factor that results in the plaintiff's injury.  "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain."  *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014).  The conduct of foreign adversaries, like Russia, is part of the background environment impacting the energy supply.  *See* Doc. 1, ¶¶ 103-104, 182-186.  In the absence of the Proclamation, domestic uranium production in Arizona would mitigate the risks associated with that conduct, such that the conduct of these third parties would not threaten the energy supply.  *See, e.g.*, *id.* ¶¶ 105-111.  However, the Proclamation prevents that domestic uranium production.  *See, e.g.*, ¶¶ 159-163, 179.  Thus, the injury sustained by the Legislature Plaintiffs is traceable to the Proclamation: but for the Proclamation, domestic uranium production would mitigate risks to the energy supply.  The fact that the conduct of third parties also contributes to this injury does not preclude traceability.  *See Mendia*, 768 F.3d at 1013-14 (finding standing despite the essential involvement of third parties in the causal chain resulting in injury).  Similarly, the injury would be redressed by a favorable result, because such a result would remove the barrier to domestic uranium production.  The State Intervenors' arguments lack merit.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should deny the State Intervenors' Motion to Dismiss.

Dated: September 27, 2024

Respectfully submitted,

JAMES OTIS LAW GROUP, LLC

*/s/ Justin D. Smith*
Justin D. Smith, Mo. Bar No. 63253*
Michael E. Talent, Mo. Bar. No. 73339*
13321 North Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(816) 678-2103
Justin.Smith@james-otis.com
* *pro hac vice*

*Attorneys for Arizona State Legislature,*
*Treasurer Kimberly Yee, Mohave County,*
*Colorado City, and Fredonia*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 27, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ Justin D. Smith*