1
2
3
4
5
6
7
8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

9

Arizona State Legislature, et al.,

10

Plaintiffs,

11

v.

12

Joseph R Biden, Jr., et al.,

13

Defendants.

No. CV-24-08026-PCT-SMM

**ORDER**

14
15

This matter is before the Court on two Rule 12(b)(1) Motions to Dismiss. (Docs. 49,

16

73). The first Motion was filed on June 3, 2024 by Defendants Joseph R. Biden Jr., *et al.*

17

(the "United States") and is fully briefed. (Docs. 49, 60, 63, 71). The second Motion was

18

filed on September 13, 2024 by Intervenor-Defendants State of Arizona and Governor

19

Katie Hobbs ("State and Governor of Arizona") and is also fully briefed. (Docs. 73, 74,

20

76). For the reasons stated below, the Court grants the Motion to Dismiss filed by the

21

United States, (Doc. 49), and dismisses this action. The Court denies as moot the Motion

22

filed by the State and Governor of Arizona. (Doc. 73).

23

## I.    BACKGROUND

24

Pursuant to the Antiquities Act of 1906, President Joseph R. Biden established the

25

Baaj Nwaavjo I'tah Kukveni – Ancestral Footprints of the Grand Canyon National

26

Monument ("Ancestral Footprints National Monument" or the "Monument") via

27

Proclamation 10606 (the "Proclamation") on August 8, 2023. See 88 Fed. Reg. 55,331

28

(Aug. 8, 2023).[1] The Proclamation reserved approximately 917,618 acres of land in Northern Arizona comprising three non-contiguous parcels of land bordering Grand Canyon National Park, Kaibab National Forest, Vermilion Cliffs National Monument, Grand Canyon-Parashant National Monument. Id. at 17, 23. Also bordering Ancestral Footprints Monument are the Navajo, Kaibab-Paiute, and Havasupai Reservations. Ibid. The Monument's purpose, as detailed in the Proclamation, is to conserve areas in the Grand Canyon region containing "over 3,000 known cultural and historic sites, including 12 properties listed on the National Register of Historic Places," 88 Fed. Reg. at 55,333; sacred or significant locations to Indigenous peoples in the region such as historic trails, cliff houses, dwelling sites, rock art, pottery, and sacred sites, id. at 55,333–34; areas of geologic and hydrologic interest, id. at 55,334–35; notable plant and animal species in the region, id. at 55,335–36; and remnants of Euro-American settlements, id. at 55,337.

The Antiquities Act, passed by Congress in 1906 and signed into law by President Theodore Roosevelt, grants the President discretion "to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. § 320301(a). Together with the authority to declare national monuments, the President is empowered to "reserve parcels of land for the monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected." § 320301(b).

President Biden's creation of Ancestral Footprints Monuments Monument does not mark the first time that the Monument's encompassed lands have been withdrawn by executive branch. After a surge in the price of uranium in the mid-2000s, thousands of new uranium mining claims were staked on the lands surrounding Grand Canyon National Park. (Doc. 1 at 16). "By 2009, more than 10,000 mining claims had been staked outside Grand Canyon National Park." (Ibid.) This surge in uranium mining claims spurred efforts at the federal level to restrict mining on the lands surrounding Grand Canyon National Park. After

---

[1] As Proclamation 10606 is central to this litigation and is not subject to reasonable dispute, the Court takes judicial notice of the Proclamation and its contents.

Congressional legislation aimed at protecting the land surrounding Grand Canyon National Park failed to secure support, the Secretary of the Interior (the "Secretary") issued a two-year ban on location and entry of new mining claims on 993,569 acres of land comprising three non-contiguous parcels that track closely with the present boundaries of Ancestral Footprints Monument. (Id. at 17). In 2011, after the two years had elapsed, the Secretary withdrew 1,010,776 acres for a further six months pursuant to his emergency authority and the 1872 Mining Law. (Id. at 18). Then, in 2012, the Secretary withdrew the same parcels—slightly diminished to a total of 1,006,545 acres—from location and entry under the General Mining Law for 20 years, subject to valid existing rights, which at the time included eleven uranium mines. (Ibid.) Several parties, including counties, associations, companies, and an individual, challenged the Secretary's 2012 land withdrawal (the "2012 FLPMA Withdrawal") in this district, claiming that the withdrawal violated several federal statutes. See Yount v. Salazar, No. CV11-8171 PCT-DGC, 2014 WL 4904423, at *1 (D. Ariz. Sept. 30, 2014). Judge Campbell upheld the withdrawal on the merits, finding that the Secretary did not act inappropriately in withdrawing the lands in order to allow the agency to complete further assessment of the potential environmental contamination that could result from increased uranium mining in the area. Id. at *17, 20, 27–28. The Ninth Circuit affirmed Judge Campbell's decision. See Nat'l Mining Ass'n v. Zinke, 877 F.3d 845, 878 (9th Cir. 2017).

Plaintiffs now seek to challenge President Biden's 2023 designation of Ancestral Footprints National Monument. This consolidated action consists of two cases filed consecutively on February 12, 2024. (Doc. 1), see CV-24-8027-PHX-SMM. The Plaintiffs in the first-filed action (collectively, "ASL Plaintiffs") include the Arizona State Legislature by and through Senate President Warren Petersen and House Speaker Ben Toma (the "Legislature"); Kimberly Yee in her official capacity as Treasurer of the State of Arizona (the "Treasurer"); Mohave County; the town of Colorado City; and the town of Fredonia (collectively, "Local Government Plaintiffs"). Chris Heaton ("Plaintiff Heaton") is the sole Plaintiff in the later-filed case. See CV-24-8027-PHX-SMM.

Plaintiffs allege that Proclamation 10606 exceeds President Biden's authority to designate national monuments under the Antiquities Act of 1906. The Antiquities Act, as ASL Plaintiffs argue, "says only certain items can be declared to be national monuments: historic landmarks, historic or prehistoric structures, or 'other objects of historic or scientific interest.'" (Doc. 1 at 24). Alternatively, to the extent that the Antiquities Act authorizes such expansive delegations, ASL Plaintiffs argue that the Antiquities Act is unconstitutional. (Id. at 1, 45). ASL Plaintiffs also argue that the National Monument conflicts with the Arizona Wilderness Act of 1984 because certain lands designated as wilderness under the Arizona Wilderness Act are encompassed by the Ancestral Footprints National Monument. (Id. at 47).

Plaintiff Heaton alleges parallel claims against many of the same Defendants. (Doc. 1 of CV-24-8027-PHX-SMM). Plaintiff Heaton is a sixth-generation cattle rancher in Northern Arizona. (Id. at 2). Plaintiff Heaton's ranch is 48,063 acres and consists of private land as well as land leased from Arizona and from the Bureau of Land Management ("BLM"). (Ibid.) The Monument now covers much of Plaintiff Heaton's ranch and "lists several alleged 'objects' that are on Mr. Heaton's Ranch." (Id. at 12). Plaintiff Heaton claims that "the Proclamation has exposed him to severe regulatory burdens and the threat of criminal penalties for engaging in everyday conduct on his Ranch." (Id. at 2).

ASL Plaintiffs focus their claims on the impact of the Proclamation on uranium mining interests and Arizona's ability to manage its State Trust Lands. (Doc. 1 at 31–32). As ASL Plaintiffs acknowledge, such uranium mining claims were actually precluded from advancing by the Secretary of the Interior's 2012 FLPMA Withdrawal. (Doc. 1 at 18) ("As a result of the Secretary of the Interior's decision, no new action on mining claims could begin until 2032."). ASL Plaintiffs contrast the temporary nature of the Secretary's 2012 decision with the Proclamation, however, stating that "[t]he Ancestral Footprints Monument makes permanent the ban on new mining within the monument." (Id. at 32). ASL Plaintiffs argue that lost revenue from uranium mining harms the State and local

communities within the State. (Doc. 1 at 33) ("Uranium mining is … critical for ensuring power provision for the State.").

The United States filed its combined Rule 12(b)(1) Motion to Dismiss this consolidated action on June 3, 2024, arguing that neither ASL Plaintiffs nor Individual Plaintiff have Article III standing to bring this action. (Doc. 49). The Motion is fully briefed. (Docs. 49, 60, 63, 71). On September 9, 2024, the Court granted the State and Governor of Arizona's Motion to Intervene[2] and the State and Governor shortly thereafter filed their Motion to Dismiss. Both Motions are fully briefed. (Docs. 49, 60, 63, 71, 73, 74, 76).

## II.    LEGAL STANDARD

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction over the action. Federal courts are of limited jurisdiction, and "Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 378 (2024). Any plaintiff who invokes the jurisdiction of a federal court is thus charged with establishing standing to bring suit. Hollingsworth v. Perry, 570 U.S. 693, 704 (2013); see also Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). "To establish standing, … a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." All. for Hippocratic Med., 602 U.S. at 368. In short, a plaintiff needs to show (a) injury, (b) causation, and (c) redressability. Ibid.

The "injury in fact" asserted by the plaintiff must be "(a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical[.]'" Lujan v. Def. of Wildlife, 504 U.S. 555, 560 (1992) (internal citations omitted) (quoting Whitmore v. Arkansas, 495

---

[2] The Court denied similar motions to intervene filed by several tribal nations and conservation organizations but found that those groups could seek to intervene again if the United States' materially position changed.

U.S. 149, 155 (1990)). In other words, "[a]bstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as a result of the challenged official conduct[.]" City of Los Angeles v. Lyons, 461 U.S. 95, 101–02 (1983); see also Clapper v. Amnesty Int'l, 568 U.S. 398, 416 (2013) (holding that parties lacked standing because "hypothetical future harm" asserted "was not certainly impending.").

"The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" All. for Hippocratic Med., 602 U.S. at 380 (quoting Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 288 (2008)). That is, an injury caused by the defendant's conduct will generally be redressed by awarding damages for or enjoining the conduct. Id. at 381. Causation requires a causal connection between the injury and the alleged conduct, meaning that "the injury has to be 'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court.'" Lujan, 504 U.S. 560 (alterations in original) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41–42 (1976)). Demonstrating redressability requires that it be "likely" rather than "speculative" that the plaintiff's injury will be redressed by a favorable decision. Lujan, 506 U.S. at 561.

### III.   ANALYSIS

#### a.  The Legislature lacks legislative standing.

ASL Plaintiffs argue that the Legislature has institutional standing to challenge the Proclamation based on the Arizona Constitution's grant of authority over State Trust Lands to the legislature. Because the Proclamation has the effect of limiting development and mining of State Trust Lands, ASL Plaintiffs argue that the Legislature suffers an injury as a result. "These injuries include institutional injuries to the Legislature's rights to implement the Enabling Act and pass laws relating to mining leases, highway easements, improvements, and the state budget." (Doc. 63 at 6).

Legislative standing to sue has generally been recognized when a dispute arises between the branches of state government in which the legislature's vote has, or is

threatened to be, nullified by a challenged law.[3] This was the case in the Supreme Court's seminal decision recognizing legislative standing, <u>Coleman v. Miller</u>, 307 U.S. 433 (1939); <u>see also</u> <u>Raines v. Byrd</u>, 521 U.S. 811, 823 (1997) ("<u>Coleman</u> stands … for the proposition that legislators whose votes would have been sufficient to defeat [or enact] a specific legislative Act have standing to sue if that legislative action goes into effect [or does not go into effect], on the ground that their votes have been completely nullified."). And it was the case in <u>Arizona State Legislature v. Arizona Independent Redistricting Commission</u>, 576 U.S. 787 (2015), which the Legislature relies on in support of its standing arguments.

Due to the intra-governmental nature of the disputes over which state legislatures have brought suit, legislative standing to sue has been raised more frequently in state court, where "standing is a prudential consideration rather than a jurisdictional one." <u>Biggs v. Cooper ex rel. Cnty. of Maricopa</u>, 341 P.3d 457, 460, 462 (Ariz. 2014) (finding that bloc of legislators had standing to sue governor, judge, and state agency director on vote nullification theory); <u>see also</u> <u>Forty-Seventh Legislature of State v. Napolitano</u>, 143 P.3d 1023, 1028 (Ariz. 2006) (finding that legislature had alleged particularized injury to legislative body as a result of governor's unconstitutional line item veto), <u>and</u> <u>Bennett v. Napolitano</u>, 81 P.3d 311, 317–18 (Ariz. 2003) (finding that four legislators failed to allege particularized injury as result of governor's veto because no legislator's vote was nullified). Although <u>Arizona State Legislature</u> was initially brought in federal court—specifically, before a three-judge panel of the federal district court pursuant to 28 U.S.C. § 2284—the nature of the dispute was still, as the United States phrases it, "an intra-sovereign dispute between two departments." (Doc. 49 at 20).

In this action, the Legislature seeks to challenge to a Presidential proclamation in federal court. The Legislature's claims are readily distinguishable on this basis alone from the ilk of intra-governmental disputes that have previously given rise to legislative

---

[3] Legislative standing to sue should not be conflated with a legislature's authority to defend the constitutionality of state legislation in federal court. <u>See</u>, <u>e.g.</u>, <u>Virginia House of Delegates v. Bethune-Hill</u>, 587 U.S. 658, 662 (2019) (legislative body which had intervened to defend the constitutionality of state's redistricting plan had "no standing to appeal the invalidation of the redistricting plan separately from the State of which it is a part").

standing, and so the Court must scrutinize whether the Legislature's alleged injuries belongs to the Legislature or whether—as the United States and Intervenor-Defendants State and Governor of Arizona argue—the Legislature's alleged injuries instead belong to the State. This distinction is not only relevant to the question of whether the Legislature has alleged a concrete and particularized injury sufficient to establish Article III standing, but it is also relevant because the Legislature is not authorized to bring claims on behalf of the State. See Brnovich v. Democratic Nat'l Comm., 594 U.S. 647, 665 (2021) ("[T]he attorney general is authorized to represent the State in any action in federal court."), citing Ariz. Rev. Stat. § 41-193(A)(3); see also State ex rel. Woods v. Block, 942 P.2d 428, 436 (Ariz. 1997) ("[C]onducting litigation on behalf of the state, as authorized by the Legislature, is an executive function, because doing so carries out the purposes of the Legislature.").

ASL Plaintiffs do not contest that the Legislature is without authority to litigate on the State's behalf but argues instead that the Legislature brings this challenge on behalf of itself. The Proclamation, ASL Plaintiffs argue, causes an institutional injury to the legislative body because "the Legislature will have to divert resources to deal with the effects the Proclamation will have on the State of Arizona." (Doc. 1 at 34). ASL Plaintiffs contend that "The Proclamation will affect the State budget in numerous ways" and detail several diversion-of-resource harms. (Id.) However, the harms that ASL Plaintiffs allege are not direct harms to the Legislature; instead, the alleged harms primarily arise from Ancestral Footprints Monument's impact on Arizona's State Trust Lands.

As ASL Plaintiffs argue, the Legislature is vested with oversight of State Trust Lands pursuant to Arizona's Constitution, which provides that:

> The legislature shall provide by proper laws for the sale of all state lands or the lease of such lands, and shall further provide by said laws for the protection of the actual bona fide residents and lessees of such lands, whereby such residents and lessees of said lands shall be protected in their rights to their improvements.

Ariz. Const. art. X, § 10. ASL Plaintiffs argue that the Legislature's authority over State Trust Lands, as conferred by the Arizona Constitution, means that harm to State Trust Lands injures the Legislature.

The Court finds that ASL Plaintiffs have failed to allege a particularized institutional injury to the Legislature. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" Spokeo, 587 U.S. at 339 (quoting Lujan, 504 U.S. at 560). The Legislature's claimed injuries do not amount to a complete nullification of the Legislature's votes, as was deemed sufficient in Coleman, nor that "the Legislature's right to have the votes of a majority given effect has been overridden and the Legislature, as an institution, has sustained a direct injury to its authority to make and amend laws by a majority vote." Forty-Seventh Legislature, 143 P.3d at 1028.

Legislative standing is appropriate in a decidedly narrow range of circumstances that are not present here. The Supreme Court in Bethune-Hill suggested in a footnote that "[a] legislative chamber as an institution … suffers no legally cognizable injury from changes to the *content* of legislation its future members may elect to enact. By contrast, the House has an obvious institutional interest in the *manner* in which it goes about its business." 587 U.S. at 670 n.6 (emphasis in original). This formulation is consistent with the circumstances in which the Supreme Court has endorsed legislative standing, including Coleman, where the legislature "challenged the right of the Lieutenant Governor to cast the deciding vote in the Senate[,]" see 307 U.S. at 436, and Arizona State Legislature, where the legislature claimed that the Arizona Independent Redistricting Commission ("AIRC"), created by a citizen initiative which amended the Arizona Constitution to divest the Arizona legislature of its redistricting power and vest it into the AIRC, deprived the legislature of its right to initiate redistricting under the U.S. Constitution. See 576 U.S. at 800 ("Proposition 106, which gives the AIRC binding authority over redistricting, strips the Legislature of its alleged prerogative to initiate redistricting.").

ASL Plaintiffs cite to the Sixth Circuit's decision in State by and through Tennessee General Assembly v. United States Department of State for the proposition that

"[I]nterference with a legislative body's specific powers, such as its ability to subpoena witnesses, or a constitutionally assigned power, may create an injury that is concrete enough for Article III standing." 931 F.3d 499, 512 (6th Cir. 2019). In <u>Tennessee General Assembly</u>, the General Assembly filed suit on its own behalf against the U.S. Department of State, alleging that the United States had violated the constitution by requiring Tennessee to provide Medicaid coverage to refugees. <u>Id.</u> at 501–02. The Six Circuit concluded that the General Assembly lacked standing to pursue claims on its own behalf against the federal government. <u>Id.</u> at 519.

   <u>Tennessee General Assembly</u> is instructive as to why the Legislature lacks standing in this action. The Sixth Circuit observed in that case that the General Assembly's "claimed injury appears to derive, if anywhere, from the alleged injury to Tennessee's sovereignty …. The impact on the General Assembly's obligation to appropriate funding is more akin to the alleged injury in <u>Raines</u>, of an abstract 'loss of political power.'" <u>Id.</u> at 514, <u>citing</u> <u>Raines</u>, 521 U.S. at 82. The same rings true here. For instance, ASL Plaintiffs allege broad injuries arising from the Legislature's "interest in vindicating its constitutionally-provided role in management and disposition of State Trust Lands" and "cognizable interest in the federal government removing or encumbering State Trust Land only through congressional action as opposed to unilateral executive action." (Doc. 1 at 37–38). ASL Plaintiffs endeavor to derive an institutional injury to the Legislature from the Proclamation's impact on the State but have articulated no more than an abstract loss of sovereign authority over State Trust Lands. The impact on State Trust Lands as a result of the Proclamation does not approach the sort of direct, particularized harms to the Legislature as have previously given rise to legislative standing.

   The Legislature is indeed obligated to "provide by proper laws" for State Trust Lands pursuant to the Arizona Constitution. <u>See</u> Ariz. Const. art. X, § 10. As ASL Plaintiffs point out in their Enabling Act arguments, "[a]fter title to [the State Trust Lands] had vested in the state [by the Enabling Act], it became exclusively the province of the state Legislature to provide a method for disposing of them which would further the objects for

which the various grants were made[.]" (Doc. 63 at 6) (quoting "Campbell v. Flying V Cattle Co., 220 P. 417, 418 (Ariz. 1923)). However, as the Arizona Supreme Court went on to say in Flying V Cattle Company, "[t]he legislature did this in 1915 by enacting the Public Land Code, in which the state land department was created and *complete authority to administer these lands* conferred upon it." Ibid. (emphasis added).

In other words, ASL Plaintiffs' Enabling Act arguments rely on an authority which the Legislature conferred on Arizona's State Land Department more than a century ago. It is indisputable that the Legislature created the State Land Department and the State Land Commissioner to manage State Trust Lands. (Doc. 63 at 5), citing Farmers Inv. Co. v. Ariz. State Land Dep't, 666 P.2d 469, 476 (Ariz. Ct. App. 1982). It is similarly indisputable that the Legislature may not bring litigation on behalf of the State Land Department because that authority belongs to the attorney general. See A.R.S. § 41-192(D); see also A.R.S. § 37-102(C) (providing that the State Land Department "may commence, prosecute and defend all actions and proceedings to protect the interest of this state in lands within this state or the proceeds of lands within this state. Actions shall be commenced and prosecuted at the request of the department by the attorney general[.]").

The same conclusion is true for the remainder of the Legislature's alleged injuries resulting from the Proclamation's impact on State Trust Lands. For instance, ASL Plaintiffs raise a mining-related theory of standing pursuant to the Legislature's "constitutional authority over sale or lease of mining rights on State Trust Land," citing to Arizona's statutory scheme governing mining leases. (Doc. 63 at 7). What ASL Plaintiffs fail to note that the cited statutes confer the authority to issue leases on the State Land Department and State Land Commissioner. See, e.g., A.R.S. §§ 27-236, 27-272. The Legislature also argues that the Proclamation diminishes the Legislature's constitutional authority over improvements of State Trust Lands, (Doc. 63 at 8), as well as airspace. (Id. at 9). It bears repeating that the Legislature has empowered the State Land Department to litigate, by and through the attorney general, "all actions and proceedings to protect the interest of this state in lands within this state or the proceeds of lands within this state." § 37-102(C).

ASL Plaintiffs' legislative standing arguments fail to trump the plain language of the statutes that the Legislature has enacted. "[A] State must be able to designate agents to represent it in federal court." Hollingsworth v. Perry, 570 U.S. 693, 710 (2013). Arizona law expressly provides that the attorney general is tasked with representing the State "in any action in a federal court." Ariz. Rev. Stat. § 41-193(A)(3). Consequently, litigating on the State's behalf is the prerogative of the executive branch, not the Legislature. See Block, 942 P.2d at 436 (Ariz. 1997); see also Va. House of Delegates v. Bethune-Hill, 587 U.S. 658, 665–66 (2019) (finding that state house of representatives was without authority to press appeal on behalf of the state after invalidation of the state's redistricting plan). ASL Plaintiffs cannot unilaterally assume that authority by claiming indirect injuries to the Legislature.

Moreover, the Legislature's expansive view of legislative standing would run afoul of the separation of powers clause enumerated in Arizona's Constitution. See Block, 942 P.2d 428 (Ariz. 1997). Arizona's Constitution, which, in creating the three departments of state, proscribes that "each department shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others." Ariz. Const. art. III. In Block, the Arizona Supreme Court considered the attorney general's challenge to the Arizona Legislature's 1994 creation of the Constitutional Defense Council ("CDC"), comprised of three members: the Governor or her designee, a member appointed by the Senate President, and a member appointed by the House Speaker. 942 P.2d at 430. The CDC's original purpose was to direct the attorney general to initiate litigation on behalf of the CDC, although the CDC could also employ outside counsel. Ibid. Then, the Legislature amended the statute in 1996 to remove the veto power of the attorney general and add two advisory members—the Chairman of the House of Representatives Committee on States' Rights and Mandates and the Chairman of the Senate Committee on Government Reform. Ibid. The Arizona Supreme Court found that the CDC constituted a legislative body performing an executive function and the statute was therefore unconstitutional under the Arizona Constitution's separation of powers clause. Id. at 437. The Arizona Supreme

Court also observed that "[t]he Legislature's actions in amending A.R.S. § 41–401 show its intent to take over an executive function by eliminating the Attorney General from the litigation process[.]" <u>Id.</u> at 436.

In bringing this action, the Legislature appears to have a similar motive as did the Legislature in <u>Block</u>: supplanting the attorney general in the litigation process. The Court's conclusion that the Legislature lacks standing here finds support in the statutory text of § 41-193(A)(8), which was amended after the Arizona Supreme Court's decision in <u>Block</u> and contemplates that the attorney general is charged with the challenging the constitutionality of Presidential acts on behalf of the state. Subsection (A)(8) of the statute provides that the attorney general shall:

> On demand by the legislature, either house of the legislature or any member of the legislature … review an executive order issued by the president of the United States … to determine the constitutionality of the executive order and whether this state should seek an exemption from the application of the executive order or seek to have the order declared to be an unconstitutional legislative authority by the president.

A.R.S. § 41-193(A)(8). While the text specifies "executive orders" rather than Presidential proclamations, the two are functionally equivalent in many respects. <u>See</u> <u>Indep. Meat Packers Ass'n v. Butz</u>, 526 F.2d 228, 234 (8th Cir. 1975) ("Presidential proclamations and orders have the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress."). By proscribing that the State is the entity which should seek have the order declared unconstitutional, the statute vests the authority to do so in the attorney general. Nowhere does it indicate that the Legislature, rather than the State by and through the attorney general, is the arm of government tasked with undertaking litigation, on behalf of itself, to declare a Presidential act unconstitutional.

In short, the Legislature endeavors to transmute injury to the legislative body from injury to the State and thereby subvert the attorney general's authority to litigate on the State's behalf. That the State is not inclined to challenge the Proclamation—as evinced by

the State's intervention as a Defendant in this matter—does not vest that authority with the Legislature. Giving credence to such an authority would run afoul of the Arizona Constitution's separation of powers clause and it would circumvent the statutorily provided-for means of ensuring that the Legislature's voice is heard in litigation conducted on behalf of the State. See A.R.S. § 41-193(A)(8).

### b.  ASL Plaintiffs lack standing based on a diversion of resources injury.

ASL Plaintiffs next argue that they have demonstrated Article III standing based on a diversion of resources theory. ASL Plaintiffs argue that "[a]n entity has standing to sue 'when it suffered both a diversion of its resources and a frustration of its mission.'" (Doc. 63 at 13) (quoting La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1088 (9th Cir. 2010) ("Lake Forest")). With respect to the Legislature, ASL Plaintiffs contend that "the Proclamation may well require new legislation to authorize such activities, and that new legislature will necessarily divert staff time and attention that otherwise would be spent on pressing state priorities." (Doc. 63 at 13). ASL Plaintiffs raise that:

> At a minimum, legislative staff will need to closely evaluate existing statutory authorities to determine whether additional legislation is necessary to permit the required collaboration with the Federal Government. That staff time necessarily will be diverted from other high-priority legislative tasks. These diversions of staff resources result directly from the Proclamation and undermine the performance of the Legislature's official duties. Thus, these diversions of resources establish standing on behalf of the Legislature and the Treasurer.

(Id. at 13–14). ASL Plaintiffs advance a similar argument on behalf of the Treasurer, arguing that the Treasurer will need to "divert resources from other vital public tasks" in order to cooperate with the federal government on wildlife management within the Monument. "These diversions of staff resources[,]" ASL Plaintiffs argue, undermine the Treasurer's ability to focus her resources on more pressing state tasks. (Doc. 63 at 13–14).

With respect to Local Government Plaintiffs, ASL Plaintiffs argue that Local Government Plaintiffs have standing to challenge the Proclamation because Local Government Plaintiffs will need to devote resources to addressing the Proclamation's impacts. (Doc. 63 at 17). "By statute, Mohave County's Board of Supervisors must prepare a comprehensive development plan every ten years," ASL Plaintiffs explain. (Doc. 63 at 17). "To assess and plan around the regulatory consequences" of the Monument's creation, "the County must invest additional staff time and resources to preparing the comprehensive plan. This use of resources necessarily will require the reallocation of staff that would otherwise be advancing other important governmental tasks." (Ibid.) ASL Plaintiffs argue that "[t]hese staff resources necessarily will come at the expense of other important governmental functions and thus support standing. (Ibid.)

As an initial matter, the Court is unpersuaded that any Plaintiff can assert Article III standing based on the diversion of resources theory that ASL Plaintiffs have advanced. The diversion of resources injury recognized by the Supreme Court in Havens Realty Corp. v. Coleman—from which the standard delineated in Lake Forest was derived, see 624 F.3d at 1088—was specific to the nonprofit organization that had brought suit in the case. 455 U.S. 363, (1982); see All. for Hippocratic Med., 602 U.S. at 396 ("Havens was an unusual case, and this Court has been careful not to extend the Havens holding beyond its context."). The Havens theory of standing has been advanced almost exclusively by similar nonprofit organizations in the cases in which the Ninth Circuit has considered organizational standing based on a cognizable diversion of resources injury, including Lake Forest. See 624 F.3d at 1085, 1088; El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev., 959 F.2d 742, 745–48 (9th Cir. 1991) (considering standing of nonprofit immigration assistance organization); Fair Hous. of Marin v. Combs, 285 F.3d 899, 902–05 (9th Cir. 2002) (considering standing of nonprofit housing organization); Smith v. Pac. Props. & Dev. Corp., 358 F.3d 1097, 1105–06 (9th Cir. 2004) (considering standing of nonprofit civil rights organization); Rodriguez v. City of San Jose, 930 F.3d 1123, 1134–35 (9th Cir. 2019) (considering standing of gun rights organization); see also Alfred L. Snapp & Son,

Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 611 (1982) ("A private organization may bring suit to vindicate its own concrete interest in performing those activities for which it was formed.") (Brennan, J., concurring) (citing Havens, 455 U.S. at 378–79). No Plaintiff in this action is an organization. ASL Plaintiffs comprise a governmental body, a government official, and three local governments. The Court is unaware of any case in this circuit in which a diversion of resources theory of standing has been considered or accepted for a governmental plaintiff. See also City and Cnty. of San Francisco v. Whitaker, 357 F.Supp.3d 931, 944 (N.D. Cal. 2018) (finding that city's organizational standing arguments were subsumed into its economic harm arguments because "a municipality's ability to claim proprietary interests to the full extent of its responsibilities, powers, and assets appears to amply cover the goals that could properly constitute the City's organizational mission.") (internal quotation marks omitted).

In any event, even if ASL Plaintiffs were able to assert an injury based on a diversion of resources theory, ASL Plaintiffs rely on a legal standard that has since been disclaimed by the Supreme Court. As the United States argues, ASL Plaintiffs' formulation of organizational standing is no longer good law after the Supreme Court's decision in Alliance for Hippocratic Medicine. (Doc. 71 at 5-6), see 602 U.S. at 394–95. Indeed, the Ninth Circuit has now recognized that its line of cases interpreting Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982), which had been construed as "allowing an organization to assert standing if it diverts resources in response to a governmental policy that frustrates its mission[,]" has been overruled by Alliance for Hippocratic Medicine. See Ariz. All. for Retired Am. v. Mayes, 117 F.4th 1165, 1170 (9th Cir. 2024). As the Ninth Circuit has stated, "the distinctive theory of organizational standing reflected in Havens Realty extends *only* to cases in which an organization can show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action." Ibid. (emphasis in original).

ASL Plaintiffs argue for standing based on a diversion of resources theory that is no longer good law. Under Alliance for Hippocratic Medicine, demonstrating an

organizational injury requires ASL Plaintiffs to show that their core activities are injured apart from their response to the Proclamation. However, ASL Plaintiffs fail to contend that their pre-existing core activities are injured by the Proclamation or that the alleged injuries suffered by the Legislature, the Treasurer, or Local Government Plaintiffs are distinct in any way from their respective responses to the Proclamation. In fact, it appears to the Court that the alleged resource diversions that ASL Plaintiffs complain of are indistinguishable from the due performance of their respective functions. ASL Plaintiff's allegations in support of this injury are wholly inadequate to demonstrate a cognizable injury sufficient for Article III standing.

### c. ASL Plaintiffs lack standing based on an injury to water rights.

ASL Plaintiffs argue with respect to Local Government Plaintiffs that the Proclamation injures Local Government Plaintiffs by creating a reservation of water that impinges on their water rights. ASL Plaintiffs argue that "by designated the landscapes as monuments, the Proclamation designates the water in the landscapes as protected monuments." (Doc. 63 at 18). "[T]he extent of the Proclamation, and its focus on water resources, creates an extensive federal-reserved right to water however measured." (Id. at 19). ASL Plaintiffs do not attempt to quantify the amount of water that will be necessary to serve the Monument's purposes but argue that such quantification is unnecessary for the Court to conclude that the Proclamation creates a substantial reservation of water. (Doc. 63 at 18). ASL Plaintiffs posit that "[t]he local need for water and the magnitude of the federal reserved right the Monument creates means the conflict between the federal government and local users like Mohave County, Colorado City, and Fredonia is 'actual or imminent.'" (Doc. 63 at 20) (quoting All. For Hippocratic Med., 602 U.S. at 380).

The United States contends that ASL Plaintiffs' standing arguments based on water rights contradict with ASL Plaintiffs' own Complaint. (Doc. 71 at 8). While the Complaint only alleges that the Proclamation has created ambiguity regarding water rights, the United States argues, ASL Plaintiffs' "Opposition claims an imminent, far-reaching injury to water rights." (Ibid.) The United States contends that ASL Plaintiffs' injection of new allegations

into their opposition to the United States' motion to dismiss is improper and such allegations should be disregarded. (Id. at 11). However, were the Court to consider ASL Plaintiffs' new allegations regarding the extent of the new federal-reserved water rights, the United States argues that "ASL Plaintiffs have identified no concrete conflict between their water rights and any reserved water right anywhere in the Monument." (Ibid.)

The Court agrees that ASL Plaintiffs have identified no conflict between ASL Plaintiffs' existing water rights and the Proclamation's impacts which amounts to a concrete injury. ASL Plaintiffs argue that the Proclamation's references to water and hydrology supports ASL Plaintiffs' position that the Proclamation creates "an extensive federal-reserved right to water," (Doc. 63 at 19), but fail to even mention the Proclamation's express disclaimer that "[n]othing in this proclamation shall be construed to alter the valid existing water rights of any party[.]" 99 Fed. Reg. 55,339. Mere conjecture regarding the Proclamation's supposed potential effects on Local Government Plaintiff's water rights is insufficient to support Article III standing. Similarly inadequate are ASL Plaintiffs' arguments that the Legislature is injured in some fashion because the Legislature bears a constitutional duty to protect the water rights of State Trust Land lessees. (Doc. 63 at 25) ("Federal interference with water rights, especially of this magnitude, undermines the Legislature's constitutional duty with regards to State Trust Lands."). The Court finds that ASL Plaintiffs have failed to show a concrete or imminent injury relating to water rights. See Spokeo, 578 U.S. at 339 ("[T]he claimed injury must be concrete, or '"de facto"'; that is, it must actually exist.") (quoting Black's Law Dictionary 479 (9th ed. 2009)); see also Lyons, 461 U.S. at 101–02 ("The Plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as a result of the challenged official conduct[.]").

### d. ASL Plaintiffs lack standing based on injury to economic or energy interests.

ASL Plaintiffs argue that Local Government Plaintiffs, the Legislature, and the Treasurer each have standing to challenge the Proclamation on the basis that the

Proclamation will reduce revenue and economic development that would otherwise be gained through uranium mining activities. (Doc. 63 at 27). Because the Proclamation precludes further development of mining claims on the lands encompassed by the Monument, ASL Plaintiffs argue that every ASL Plaintiff—especially Mohave County, one of the Local Government Plaintiffs—will be injured by the Proclamation's impact on economic development associated with uranium mining. (Id. at 27–28). ASL Plaintiffs also raise the argument that all Plaintiffs are energy consumers now at risk of energy disruption and higher energy prices due to the Proclamation's restrictions on uranium mining. (Id. at 27). The Court evaluates the standing arguments of each of the ASL Plaintiffs with respect to the asserted economic and mining interests at stake.

i.    Standing of the Legislature

ASL Plaintiffs argue that the Legislature has standing to bring this action on the basis that the Proclamation will decrease revenue to the state budget from State Trust Lands and mining. (Doc. 63 at 27). However, ASL Plaintiffs advance no justification for why reduced revenue harms the Legislature directly as opposed to the State of Arizona. Consequently, ASL Plaintiffs' theory of standing as to the Legislature is unavailing the same reasons as stated above in the Court's legislative standing analysis. Lessened revenue to the state budget and state fund do not amount to a particularized injury to the Legislature which would empower the Legislature to bring suit on its own behalf.

ii.    Standing of the Treasurer

ASL Plaintiffs argue that the Treasurer is adversely impacted by the Proclamation in the context of uranium mining because "[t]he Treasurer exercises 'those powers of the surveyor-general with respect to the selection of lands' under A.R.S. § 37-202." (Doc. 63 at 34–35. ASL Plaintiffs argue that "the Treasurer is responsible for all surveying necessary to secure title to State Trust Land and to determine distribution of water to benefit State Trust Land." (Id. at 35). "The Proclamation affects water rights and State Trust Land … and thus will impact past and future surveys the Treasurer performs as surveyor-general." (Ibid.)

It is unclear to the Court how the Proclamation's impact on the Treasurer's land surveys constitutes an injury. In any event, ASL Plaintiffs' argument on this basis has been more or less disposed of because the Court has already determined that the Treasurer is not empowered to bring litigation on behalf of the State Land Department and that Plaintiffs have failed to establish any concrete water rights injury.

iii.    Standing of Local Government Plaintiffs

ASL Plaintiffs primarily direct their mining revenue-related standing arguments towards economic harms that the Proclamation causes to Local Government Plaintiffs' propriety interests. Because the Proclamation prohibits development of uranium mining claims staked within the Monument's boundaries, "Mohave County, Colorado City, and Fredonia allege the Proclamation will reduce the tax revenue they collect due to reduced mining activities and reduced economic development." (Doc. 63 at 28). "Mohave County also alleges that the reduced revenue will impose costs on its relating to its poverty services and measures to address budget shortfalls." (Ibid.)

The United States argues that the restrictions on uranium mine development that ASL Plaintiffs identify were already in place by way of the 2012 FLPMA Withdrawal, which withdrew the lands encompassed by the Monument for a period of 20 years. (Doc. 49 at 25, Doc. 71 at 14). The 2012 Withdrawal is still in place. See 88 Fed. Reg. 55,342 ("Nothing in this proclamation shall be deemed to revoke any existing withdrawal, reservation, or appropriation; however, the monument shall be the dominant reservation."). ASL Plaintiffs acknowledge as much in their Complaint. (Doc. 1 at 32) ("As a result of the Secretary of the Interior's decision, no new action on mining claims could begin until 2032"). The United States argues that ASL Plaintiffs' claimed injuries are thus not imminent or "certainly impending" because any economic injury suffered as a result of the Proclamation would not materialize until after 2032. (Doc. 71 at 15). Moreover, the United States argues, ASL Plaintiffs' alleged economic injuries are contingent on future uranium prices being high enough to generate renewed interest in mining the lands after 2032. (Ibid.)

The United States cites to McConnell v. Federal Election Commission in support of its position that ASL Plaintiffs lack standing due to the remoteness of the alleged injury. 540 U.S. 93, 226 (2003), overruled in part on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010). In McConnell, the Supreme Court determined that a U.S. Senator lacked standing to challenge a federal law because the earliest that the Senator could be affected by the law was during the Senator's re-election bid in five years. Ibid. The Supreme Court held that the Senator had failed to establish an injury in fact because the injury was "too remote temporally to satisfy Article III Standing." Ibid.

ASL Plaintiffs contend that the Court should not defer to McConnell because it is a "splintered and overruled decision[.]" (Doc. 63 at 31). This argument is unavailing. Although McConnell was indeed later overruled by Citizens United, it was overruled on the substantive questions presented—entirely separate and distinct from the issue of standing. The requirement that an injury be certainly impending for Article III standing purposes necessitates some temporal inquiry.

The Court finds that ASL Plaintiffs have failed to show that Local Government Plaintiffs have standing based on injuries to Local Government Plaintiffs' propriety interests caused by the Proclamation. ASL Plaintiffs' theory of standing suffers from several deficiencies; first, ASL Plaintiffs' asserted injuries are not imminent or certainly impending. Second, ASL Plaintiffs argue for Local Government Plaintiffs' standing based primarily on a prior decision in this district as to Mohave County that does not bear on the current litigation. Third, ASL Plaintiffs have not identified any meaningful distinction between the 2012 Withdrawal and the Proclamation that would constitute an imminent injury. Finally, ASL Plaintiffs have not shown that a favorable decision in this action would redress Local Government Plaintiffs' asserted injuries.

With respect to imminency, ASL Plaintiffs have not shown that the Proclamation causes imminent economic harm to Local Government Plaintiffs because the lands reserved by the Proclamation were already withdrawn until 2032 via the 2012 Withdrawal. The mining claims that were staked in the mid-2000s after uranium prices spiked were

halted by the 2012 Withdrawal, not the Proclamation. The economic gains that Local Government Plaintiffs may have secured after 2032 if not for the 2012 Withdrawal and the Proclamation's permanent ban on mining development are too remote and too speculative to support an injury in fact and, as the United States argues, the extent of any economic injury is likely dependent on uranium prices, as well as the future interest of mining companies in pursuing uranium mine development in the area. See Lujan, 504 U.S. at 562 (explaining that standing is substantially more difficult to establish when "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'") (quoting ASARCO, Inc. v. Kadish, 490 U.S. 605, 615 (1989)). Consequently, Local Government Plaintiffs' alleged economic harms are far from "certainly impending." Clapper v. Amnesty Int'l, 568 U.S. 398, 422 (2013).

With respect to Mohave County's standing, ASL Plaintiffs' arguments are unavailing because ASL Plaintiffs rely almost exclusively on a prior decision from this district, Yount v. Salazar, to argue that this Court should find Article III standing as to Mohave County—and, by extension, the other Local Government Plaintiffs. See No. CV11-8171-PCT DGC, 2013 WL 93372 (D. Ariz. Jan. 8, 2013). In Yount, several mining companies and associations, including a coalition representing Mohave County, challenged the Secretary's 2012 Withdrawal. Id. at *1. Upon a review of Mohave County's General Plan and 40-year revenue projections, which estimated that—if not for the 2012 Withdrawal—uranium mining would have created 1,078 new jobs and generated $40 million annually from payroll, $29.4 billion in output, $2 billion in federal and state income taxes, as well as other benefits, Judge Campbell concluded that Mohave County had alleged sufficient facts to support the County's standing to challenge the Secretary's 2012 Withdrawal. Id. at *10–14.[4]

---

[4] As earlier stated, Judge Campbell went on to grant summary judgment in favor of the defendants, upholding the 2012 Withdrawal against the plaintiffs' constitutional and statutory challenges. See Yount, 2014 WL 4904423, at *27–28.

However, that Mohave County had standing in that case does not summarily impel the conclusion that Mohave County now has standing to challenge the Proclamation. Judge Campbell's decision was made 12 years ago based on Mohave County's contemporaneous projections as to economic injury caused by the 2012 Withdrawal. The economic projections that Judge Campbell considered—which ASL Plaintiffs attach to this case as support for their arguments—are not persuasive evidence of the County's projections more than a decade later, particularly since Mohave County's challenge to the 2012 Withdrawal was unsuccessful on the merits. Nor does ASL Plaintiffs' Complaint in this action proffer new allegations of reduced economic projections; the Complaint merely alleges that "the Proclamation will result in a loss of tax revenue to Mohave County from reduced mining activities and reduced economic development resulting from the reduced mining activities." (Doc. 1 at 39). The Court cannot draw conclusions as to Mohave County's proprietary interests and projected economic harms based on a decision rendered in a different case 12 years ago.

ASL Plaintiffs also contend that the Proclamation does have immediate impact on Local Government Plaintiffs because the Proclamation prohibits more activities than does the 2012 Withdrawal. (Doc. 63 at 29–30). In particular, ASL Plaintiffs highlight language of the 2012 Withdrawal stating that the withdrawn lands "are hereby withdrawn from location and entry under the Mining Law of 1872 (20 U.S.C. 22-54), but *not* from the mineral leasing, geothermal leasing, mineral materials or other public lands laws[.]" 77 Fed. Reg. 2,563 (Jan. 18, 2012) (emphasis added). ASL Plaintiffs argue that, by contrast, "[t]he Proclamation affected more rights than the 2012 Withdrawal, including those leasing activities that the Withdrawal expressly excluded[.]" (Doc. 63 at 30). ASL Plaintiffs cite text of the Proclamation stating that the lands encompassed by the Monument are withdrawn "from location, entry, and patent under the mining laws; *and* from disposition under all laws relating to mineral and geothermal leasing." 88 Fed. Reg. at 55,339 (emphasis added). Accordingly, ASL Plaintiffs argue that "the Proclamation immediately harms Plaintiffs by eliminating the possibility of tax revenue and other economic

development relating to mineral leasing, geothermal leasing and patent under the mining laws." (Doc. 63 at 30).

As the United States counters, however, ASL Plaintiffs' argument as the immediate impact of the Proclamation is unavailing because ASL Plaintiffs' claimed injuries are based on the development of uranium mining claims rather than mineral leasing, geothermal leasing, or patents. (Doc. 71 at 14). ASL Plaintiffs' Complaint contains no allegations of harm suffered as a result of the Proclamation's impact on mineral or geothermal leasing. As such, ASL Plaintiffs have identified no concrete injury that will imminently result due to the additional exclusions contained in the Proclamation.

Even were the Court to conclude that ASL Plaintiffs had alleged a cognizable injury in fact resulting from the Proclamation, the Court is unpersuaded that ASL Plaintiffs' injury would be redressed by a favorable decision in this case. The 2012 Withdrawal that is still in effect was heavily premised on the need to examine the potential environmental effects of uranium mining, including possible contamination of groundwater sources and the Colorado River. See Zinke, 877 F.3d at 859 ("Because of the uncertainty regarding the movement of groundwater in the region, the [Record of Decision] explained, Interior could not risk contamination of springs feeding into the Colorado River.") (discussing the Secretary's basis for the 2012 Withdrawal). "Uranium mining has been associated with uranium and arsenic contamination in water supplies, which may affect plant and animal growth, survival, and reproduction, and which may increase the incidence of kidney damage and cancer in humans." Id. at 857. The Ninth Circuit upheld the 2012 Withdrawal, finding that the Secretary's decision to withdraw the lands from mining development was not arbitrary or capricious. See id. at 878 ("As Interior concluded, withdrawal of the area from new mining claims for a limited period will permit more careful, longer-term study of the uncertain effects of uranium mining in the area and better-informed decisionmaking in the future.").

The United States asserts, and ASL Plaintiffs do not contest, that the Secretary may, under the FLPMA, choose to extend the withdrawal for another twenty years once the 2012

Withdrawal is set to expire. (Doc. 49 at 27). If the Secretary should choose to extend the withdrawal, then any relief granted by this Court would not redress Local Government Plaintiffs' alleged economic injuries. While it is uncertain that the Secretary would renew the withdrawal in order to continue evaluating the environmental contamination that may result from uranium mining, the parties do not discuss the potential of a renewal in detail and the Court cannot draw conclusions as to its likelihood. Given this uncertainty, the Court cannot conclude, based on the allegations and arguments presented, that ASL Plaintiffs' have alleged a significant likelihood that a favorable decision in this action would redress their claimed injuries. See Gonzales v. Gorsuch, 688 F.2d 1263, 1267 (9th Cir. 1982) ("It is a prerequisite of justiciability that judicial relief will prevent or redress the claimed injury, or that there is a significant likelihood of such redress."); see also Lujan, 506 U.S. at 561.

In sum, ASL Plaintiffs have not met their burden of showing an imminent injury to Local Government Plaintiffs that is traceable to the Proclamation because the 2012 Withdrawal already prohibited mining claim development until 2032. In addition, ASL Plaintiffs have not alleged a cognizable injury to Local Government Plaintiffs' proprietary interests occurring after 2032, nor have ASL Plaintiffs shown that this injury would be redressed by judicial relief in this action. The Court finds that Local Government Plaintiffs lack Article III standing based on injury to propriety interests.

### iv.    Standing as energy consumers

ASL Plaintiffs contend that ASL Plaintiffs have Article III standing to bring this action because all Plaintiffs "are energy consumers that are now subject to the risk of disruption and higher energy prices." (Doc. 63 at 27). As ASL Plaintiffs aver in their Complaint, "the Proclamation impairs domestic mining of uranium and so increases and reinforces reliance on foreign imports—which increases the risks and instability of nuclear power as a source of energy." (Doc. 1 at 35). ASL Plaintiffs' alleged injury presupposes that the federal government would fail to alter its position in anticipation of foreign instability which would impact uranium imports. This argument is exceedingly speculative

and ASL Plaintiffs expend little of their Opposition brief in defense of it. The Court concludes that ASL Plaintiffs' fears of potential geopolitical shifts that may impact domestic uranium prices in the future are inadequate to support an injury-in-fact.

### e. Individual Plaintiff Chris Heaton lacks standing.

Plaintiff Heaton argues that he has Article III standing to challenge the Proclamation because the Monument encompasses the portion of Plaintiff Heaton's ranch that he leases from BLM. (Doc. 1, CV-24-8027). Plaintiff Heaton alleges several harms as a result of the Proclamation; for instance, Plaintiff Heaton alleges that "[i]f Mr. Heaton appropriates, injures, destroys, or removes any feature of the Monument … he is subject to criminal penalties[.]" (Id. at 13). Plaintiff Heaton proffers that he regularly removes trees from springs on his ranch and cleans earth ponds with heavy equipment. (Ibid.) Plaintiff Heaton claims that he could be subject to criminal penalties for removing cactus, picking up pottery shards, and hiking. (Ibid.) Because the Proclamation designates "entire landscapes" as objects of historic and scientific interest, Plaintiff Heaton alleges that he is subject to criminal penalties if he "injures, destroys, or removes any item—rock, shrub, or even blade of grass—identified or unidentified in the Proclamation." (Ibid.) Plaintiff Heaton additionally alleges an injury from regulatory burdens, arguing that he will suffer "decreased income, ranching opportunities, and opportunities to use his ranch—including his existing grazing permits and water rights." (Id. at 14). In Plaintiff Heaton's opposition to the United States' Motion to Dismiss, Plaintiff Heaton raises additional arguments, contending that he will suffer an aesthetic and recreational injury as a result of increased tourism on and around his ranch. (Doc. 60 at 14–15).

The United States counters that Plaintiff Heaton has failed to allege any of the elements necessary to show a pre-enforcement injury. (Doc. 49 at 34). The United States argues that Plaintiff Heaton cannot establish standing based on increased regulatory burdens as a result of the Proclamation because the Proclamation expressly does not impact existing grazing leases. (Id. at 34–35). Plaintiff Heaton's claims, the United States argues, also suffer from a redressability problem because, even absent the penal provisions of the

1    Antiquities Act, Plaintiff Heaton could presumably still face prosecution for appropriating

2    artifacts under the federal theft statute. (Doc. 49 at 36). With respect to Plaintiff Heaton's

3    aesthetic injury arguments, the United States contends that Plaintiff Heaton omitted any

4    mention of increased tourism in Plaintiff Heaton's Complaint and that the Court should

5    disregard Plaintiff Heaton's aesthetic injury arguments. (Doc. 71 at 15–17).

6                              i.   Threat of criminal penalties

7        Plaintiff Heaton raises a pre-enforcement injury to the Proclamation based on

8    anticipated enforcement of 18 U.S.C. § 1866(b) against Plaintiff Heaton for conducting

9    activities on the BLM-leased portion of Plaintiff Heaton's ranch. Section 1866(b) provides

10   criminal penalties for whomever "appropriates, excavates, injures, or destroys any historic

11   or prehistoric ruin or monument or any other object of antiquity that is situated on land

12   owned or controlled by the Federal Government without the permission of the head of the

13   Federal agency having jurisdiction over the land[.]"

14       Pre-enforcement injury may give rise to Article III standing where a plaintiff is

15   deterred from exercising his constitutional rights due to the threatened enforcement of a

16   law. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158–59 (2014) "Pre-enforcement

17   standing injuries are predicated on the anticipated enforcement of the challenged statute in

18   the future and the resulting chilling effect in the present." Seattle Pac. Univ. v. Ferguson,

19   105 F.4th 50, 59 (9th Cir. 2024). In order to allege a pre-enforcement injury, "(1) a plaintiff

20   must allege 'an intention to engage in a course of conduct arguably affected with a

21   constitutional interest,' (2) a plaintiff's intended future conduct must be 'arguably ...

22   proscribed by [the] statute' it wishes to challenge, and (3) the threat of future enforcement

23   must be 'substantial.'" Ibid. (quoting Driehaus, 573 U.S. at 151).

24       With respect to the first element, Plaintiff Heaton argues that he "has alleged a

25   course of conduct—numerous activities he engages in on the Monument—arguably

26   effected with the constitutional interest of not being prosecuted for strict-liability crimes

27   and deprived of the use of his liberty or property." (Doc. 60 at 11). The activities Plaintiff

28   Heaton raised in his Complaint, as detailed above, include hiking, removing cacti and trees,

cleaning ponds, and picking up pottery shards. (Doc. 1 at 13, CV24-8027). As to the second element, Plaintiff Heaton argues that such activities are "arguably proscribed by statute" because Plaintiff Heaton and his family "could accidentally cause harm to the innumerable objects protected on the Monument[,]" which would be illegal under § 1866(b). (Doc. 60 at 12). Lastly, Plaintiff Heaton argues that the Proclamation creates a credible threat of enforcement against Plaintiff Heaton for accidentally harming any part of the monument. (Id. at 12–13).

The United States counters that § 1866(b) is not a strict liability statute because it exempts individuals with agency permission—like Plaintiff Heaton, who possesses a grazing permit for the Monument's encompassed lands—from its scope, and thus Plaintiff Heatons' alleged constitutional interest in not being subject to a strict liability statute is groundless. (Doc. 71 at 18). The United States further argues that Plaintiff Heaton's arguments fail because Plaintiff Heaton cannot establish a credible threat of enforcement for accidental injury to the monument. (Ibid.) The United States avers that the only past prosecutions under §1866(b) have involved the intentional appropriation of artefacts—not, as Plaintiff Heaton fears, accidental destruction or appropriation. (Id. at 18–19).

The Court finds that Plaintiff Heaton has alleged the first element of a pre-enforcement injury because he has alleged a course of conduct affected with an interest in avoiding the deprivation of his liberty and property. See Isaacson v. Mayes, 84 F.4th 1089, 1099 (9th Cir. 2023) (finding that plaintiff doctors had alleged imminent future injuries affecting constitutional interests because violations of the challenged statute could result in loss of liberty, i.e. imprisonment, or property, i.e. medical license revocation, loss of revenue, or monetary damages). Similarly, the Court finds that Plaintiff Heaton has adequately alleged that at least some of his anticipated accidental conduct—namely, damage to or removal of artefacts or pottery shards—is proscribed by §1866(b).

However, Plaintiff Heaton fails to demonstrate the final element of a pre-enforcement injury: that the threat of future enforcement is substantial or credible. Plaintiff Heaton merely alleges a fear of enforcement that could result from Plaintiff Heaton's

accidental damage to or appropriation of plants or small artefacts on the portion of his ranch that he leases from BLM. As the United States argues, there have been no instances in which § 1866(b) was enforced against individuals who accidentally damaged objects of antiquity. Plaintiff Heaton's alleged fears of prosecution for damaging grass or moving pottery shards do not confer Article III standing to challenge the Monument because Plaintiff Heaton has not shown that there is any substantial threat of § 1866(b) being enforced on him. Consequently, the Court finds that Plaintiff Heaton has failed to allege a pre-enforcement injury.

                                ii.   Regulatory burdens

     Plaintiff Heaton argues that the Proclamation subjects Plaintiff Heaton to new regulatory burdens sufficient to give him Article III standing. (Doc. 60 at 8–9). "For example, Mr. Heaton annually applies to BLM for permits to make improvements to his ranch, including for water catchments[.]" (Id. at 8). Plaintiff Heaton "plans to apply for permits to build water catchments, water pipelines and to drill wells." (Ibid.) When Plaintiff Heaton does apply for these new permits, Plaintiff Heaton argues that the BLM officials reviewing his applications will need to account for the Proclamation and the Antiquities Act when determining whether to approve the permits. (Ibid.) Plaintiff Heaton alleges that "[t]his increased regulatory hurdle creates standing." (Ibid.) Plaintiff Heaton endeavors to minimize the burden on him to show Article III standing, stating that "[w]here 'the legality of government action or inaction' is being challenged, 'there is ordinarily little question' of standing for a plaintiff who is the 'object of the action (or foregone action) at issue.'" (Doc. 60 at 8) (quoting Lujan, 504 U.S. at 561–62).

     The United States argues in opposition that Plaintiff Heaton's regulatory burden arguments fail on two grounds; first, Plaintiff Heaton did not allege any increased burdens associated with filing for new permits in his Complaint, and thus the Court should disregard Plaintiff Heaton's arguments on this point. (Doc. 71 at 17). Second, the United States counters that the Proclamation places no new regulatory burdens on Plaintiff Heaton; instead, the regulatory burden falls on the BLM officials, "who may have to perform

1  additional work to assess the impact of the requested permits on monument objects[.]"
2  (Ibid.).

3        The United States is correct that Plaintiff Heaton has alleged no regulatory burden
4  associated with BLM permits in his Complaint. (Doc. 1, CV24-8027). Irrespective of this
5  deficiency, however, Plaintiff Heaton's regulatory burden arguments are unavailing.
6  Plaintiff Heaton has failed to show that the Proclamation imposes a regulatory burden on
7  Plaintiff Heaton's operation of his ranch. Due to the fact that Plaintiff Heaton leases a
8  portion of his ranch from BLM and operates under federal permits, Plaintiff Heaton is
9  already necessarily subject to some regulations, such as Plaintiff Heaton's obligation to
10 annually apply for new permits. (Doc. 60). Any new burden caused by the Proclamation
11 on the issuance of such permits falls on the BLM, not Plaintiff Heaton. Similarly, Plaintiff
12 Heaton has failed to show a non-speculative injury arising from any future impact of the
13 Proclamation on Plaintiff Heaton's grazing rights. The Proclamation expressly provides
14 that "[n]othing in this proclamation shall be deemed to prohibit grazing pursuant to existing
15 leases or permits within the monument, or the renewal or assignment of such leases or
16 permits, which the BLM and Forest Services shall continue to manage pursuant to their
17 respective laws, regulations, and policies." 88 Fed. Reg. at 55,341. Accordingly, any fears
18 of Plaintiff Heaton that he will be injured by increased regulatory burdens do not amount
19 to concrete and particularized harm necessary to support Article III standing.

20              i.    Other arguments

21       Plaintiff Heaton alleges an aesthetic injury caused by the potential of increased
22 tourism on his ranch. As the United States counters, however, Plaintiff Heaton failed to
23 raise any allegations pertaining to harm caused by potential increased tourism. Further,
24 Plaintiff Heaton has alleged no facts to support his argument that there will be an increase
25 in tourism to Plaintiff Heaton's ranch. A generalized fear of potential increased tourism
26 does not amount to an injury in fact sufficient for Article III standing. See Clapper, 568
27 U.S. at 1148 (finding that plaintiffs' "highly speculative fear" did not constitute a certainly
28 impending injury).

Equally unavailing is Plaintiff Heaton's argument that the Court should apply a lower bar for Plaintiff Heaton's standing to challenge the Proclamation because his "claims all concern the separation of powers." (Doc. 60 at 15). Plaintiff Heaton's want of Article III standing is not cured by the fact that Plaintiff Heaton alleges that the Proclamation violates the separation of powers doctrine.

Because the Court finds that Plaintiff Heaton has failed to allege a cognizable injury in fact, the Court need not address Plaintiff Heaton's remaining standing arguments as to causation and redressability.

## IV.    CONCLUSION

Upon review of the parties' briefing on the United States' Rule 12(b)(1) Motion to Dismiss, the Court concludes that none of the ASL Plaintiffs nor Plaintiff Heaton have established Article III standing to bring this action.[5] As no Plaintiff has standing, the Court lacks subject matter jurisdiction over this matter and dismisses the parties' Complaints without prejudice pursuant to Rule 12(b)(1).[6] See Frigard v. United States, 862 F.2d 201, 204 (9th Cir. 1988) (dismissals for lack of subject matter jurisdiction should ordinarily be without prejudice). In dismissing this action, the Court does not reach the merits of Plaintiffs' claims regarding the Proclamation and the scope of presidential authority under the Antiquities Act; the Court finds only that these Plaintiffs cannot pursue such claims in this forum. Because the Court did not reach the later-filed Motion to Dismiss by the State and Governor of Arizona, (Doc. 73), the Court denies that Motion as moot.

**IT IS THEREFORE ORDERED granting** the United States' Motion to Dismiss. (Doc. 49).

**IT IS FURTHER ORDERED dismissing without prejudice** this action.

**IT IS FURTHER ORDERED denying as moot** the State and Governor of Arizona's Motion to Dismiss. (Doc. 73).

---

[5] Because the Court has found that no Plaintiff has standing to bring this action, the Court need not address Plaintiff Heaton's request to proceed with the suit if any single Plaintiff has standing. (Doc. 60 at 17).

[6] Neither ASL Plaintiffs nor Plaintiff Heaton have requested leave to amend their respective Complaints in the event of dismissal.

**IT IS FURTHER ORDERED directing** the Clerk of Court to terminate this action.

Dated this 27th day of January, 2025.

Stephen M. McNamee
Senior United States District Judge